**UNITED STATES of America,**
**Appellee,**

v.

**Earl S. BAIRD, Defendant-Appellant.**

**No. 645, Docket 33026.**

United States Court of Appeals
Second Circuit.

Argued June 11, 1969.

Decided Aug. 4, 1969.

Charles P. Sifton, Asst. U. S. Atty., Southern Dist. of New York (Robert M. Morgenthau, U. S. Atty., Gary P. Naftalis and Albert J. Gaynor, Asst. U. S. Attys., Southern Dist. of New York, on the brief), for appellee.

Simon H. Rifkind, New York City (Paul Weiss, Goldberg, Rifkind, Wharton & Garrison, Jay H. Topkis, and Allan A. Tuttle, Kostelanetz & Ritholz, Boris Kostelanetz, New York City, on the brief), for defendant-appellant.

Before MOORE, SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

On March 13, 1966 the appellant, Earl S. Baird, was charged in a five-count information with violations of 26 U.S.C. § 7203 for wilful failure to file income tax returns, within the required time, for the years 1959 to 1963, inclusive. The jury returned verdicts of guilty on all counts; and on November 15, 1968, he was sentenced to three months imprisonment on each count, the sentences to be served concurrently, and he was also fined $1,000 on each count. The appellant is presently enlarged on bail pending this appeal.

Baird did not dispute the allegation that he failed to file the returns. Rather, his defense at trial was based on (1) a denial that the failure was "wilful" and (2) a claim that, during the years in question, he lacked the capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law by reason of a mental disease or defect.

The Government's evidence showed that the appellant actively and successfully carried on his business during the years of his failure to file returns. From 1954 through 1963 he was a partner and floor broker with the New York City securities firm of Baird & Company. He generally received the second largest distributive share of partnership income, ranging from a low of $27,480.-62 in 1957 to $86,646.53 in 1959. This income was supplemented by his trading in the market on his own account through which in 1961 he made as much at $60,668, giving him a gross income for that year of $121,943.58.

On the wilfulness issue, the defense sought to show that Baird was an ill man who innocently assumed that his tax returns were being prepared for him by someone else. Testimony was offered to show that the stock brokerage firm of Brady, Baird & Garvin of which the appellant had been a partner and floor broker on the American Stock Exchange from 1944 to 1954, made it a practice to have its auditor prepare the federal income tax returns of the partners. David G. Baird, senior partner of Baird & Company and older brother of appellant, Earl S. Baird, testified that

he noticed that his brother's health was declining in the early 1950's and convinced the appellant to join Baird & Company in 1954 where he could be under David Baird's care. He said the appellant acted as a "special messenger" at the firm, and his work "did not require a great deal of imagination or freedom of action on his part." David Baird also testified that he observed a deterioration in appellant's physical condition and working habits in 1957, including severe headaches and loss of vision, as well as nervousness, irritability and uncertainty; and that in March, 1957, in the presence of appellant, he instructed William Brome, one of the partners in the firm, " * * * to relieve my brother of every possible detail, to take care of his taxes the same as he took care of mine * * * to take care and prepare his taxes as he prepared mine, to do everything that he could to relieve Earl of any detail work or responsibilities as far as humanly possible."

The defense also presented evidence to show that the appellant was hospitalized during July and August 1958, first at New York Eye and Ear Infirmary and then at St. Vincent's Hospital because of visual difficulties he was experiencing. On August 2, 1958, the appellant was discharged from St. Vincent's Hospital with a discharge diagnosis of optic neuritis. Dr. Mortimer R. Cholst, an ophthalmologist, testifying on the basis of his examination of the appellant in the fall of 1964 and the St. Vincent's Hospital and New York Eye and Ear Infirmary records, concluded that the appellant was suffering from a generalized, slow, progressive circulatory disease which began in 1957 and continued through 1964.

The defense relied primarily on two expert witnesses in its presentation of the criminal responsibility defense based on the standard enunciated in United States v. Freeman, 357 F.2d 606 (2 Cir. 1966). Dr. Peter G. Denker, a psychiatrist, gave his opinion, based on one examination which he made on October 26, 1964 (seven days after appellant filed eight delinquent tax returns, following an interrogation of Baird by the Internal Revenue Service), and which consisted of conversations with the appellant and his brother, David Baird, that the appellant had a "reactive depression."[1] In response to a long hypothetical question based upon the St. Vincent's Hospital and the New York Eye and Ear Infirmary records, plus an assumption of the facts claimed to have been proved by the defense case, Dr. Denker stated: "I think he was suffering from a combination of circulatory impairment in his brain with cerebral atrophy, reactive depression." He added:

"He could do messenger work. He could follow instructions, I presume, from whoever his superior or associates might be. But if it came to individual judgments, responsibilities, I think he would be making errors."

Dr. Denker's conclusion was that the appellant lacked substantial capacity to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the income tax laws.

Dr. Denker was also permitted to testify to numerous out-of-court statements made by the appellant during the psychiatric examination. Although the truth or falsity of these self-serving, hearsay declarations was relevant but not generally admissible on the "wilfulness" issue, they were admitted under the exception to the hearsay rule that it was not for the truth of what the doctors said the appellant said or what

---

1. Dr. Denker defined reactive depression as " * * * a severe, an out of proportionate emotional reaction which a person often gets excessively frightened, excessively depressed, they lose their normal interests, they lose their friendliness, their sociability. They may get nervous and tense, they don't sleep well. Their judgment may be impaired, and it encompasses most all their behavior patterns. They lose sex desire very often. As a matter of fact, at times they can become so depressed that they get suicidal."

Mr. David Baird told the doctors but as a description of the material on which the doctors based their opinions.[2] For example, Dr. Denker testified that the appellant "made no significant attempt to explain his lack of filing income tax returns, tending to shrug the question off, and saying, 'I took it for granted that all these were being taken care of.'"[3]

This theory—that the out-of-court statements were admitted only to establish the foundation for the expert's opinion, not for their truth or falsity—makes the assumption, as a convenient legal fiction,[4] that the jury is able to ignore the fact that the expert's report of what the accused said and what David Baird said[5] actually put before the jurors the accused's own story in defense without his taking the witness stand.

The defense presented the opinions and conclusions of a second psychiatrist, Dr. Morris Herman, whose testimony also related to numerous self-serving out-of-court statements made by the appellant, which were admitted on the ground that they were part of the basis for Dr. Herman's opinion that the appellant was not criminally responsible.[6]

---

2. In his charge, Judge Wyatt stated:
 "In connection with the testimony of the psychiatrists, you may recall that they testified among other things, to what the defendant told them, and in the case of Dr. Denker and Dr. Herman, also to what the defendant's brother, David, told them. This testimony by the psychiatrists as to what they were told is not any evidence that what the defendant and his brother said was true and it was not admitted for any purpose, but solely to indicate the basis for the opinion of the psychiatrists."

3. On this theory, Dr. Denker was also permitted to make the following general character endorsement: "Furthermore, he told me that he had previously, for a good number of years, say, at least 15 or 20 years, whenever he was out working, had always in preceding years paid his taxes as I should say a good citizen should."

4. See Bruton v. United States, 391 U.S. 123, 128–129, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). As to Supreme Court said in *Bruton*, speaking of Judge Learned Hand's severe criticism of the proposition that juries could be counted on to disregard evidence admitted for one limited purpose when considering other issues:
 "In Judge Hand's view the limiting instruction, although not really capable of preventing the jury from considering the prejudicial evidence, does as a matter of form provide a way around the exclusionary rules of evidence that is defensible because it 'probably furthers, rather than impedes, the search for truth * * *.' Nash v. United States, 54 F.2d 1006, 1007." 391 U.S. at 133, 88 S.Ct. at 1626.

5. Dr. Denker was permitted to state, *inter alia*:

"The brother told me about this patient [appellant] that he had begun speculating in the stock market and showed very poor judgment about his investments. * * * He didn't think he made money on these investments, but was just 'churning.' * * *
 * * * * *
"He feels he has had to handle the patient with kid gloves as he realizes the patient is not himself and was worrying about his eyes."

6. Examples of such testimony follow:
 "He [appellant] told me that he never remembered making out an income tax. "I asked him, 'Well, did you sign any?' "He said he thinks he must have, but he doesn't recall it specifically at this time. "Then I asked him how it was done in the firm that he belonged to when he was on the floor of the American Stock Exchange, which was the one immediately before this period.
 * * * * *
"And he said this was done by the firm, that his income tax was drawn up and sent by the firm. * * *
"Then the first part, the first year of his being in the firm, which is still prior to this date, again he has no recollection or knowledge that any material was required from him or that he took part in any proceedings relating to income tax forms or work. This was his response to me about this particular pattern.
 * * * * *
"Then I asked him, 'What happened to you in connection with receiving any notices? * * *'
"He said he has no awareness of whether they did come or didn't come, that in the past if he received anything like this he would simply automatically turn

At a pre-trial conference on September 16, 1968, two days before trial, Government counsel had informed the court that he had reason to believe that Dr. Denker would testify as a defense expert on the question of criminal responsibility. On the following day the Government moved to have the defendant psychiatrically examined by Dr. David Abrahamsen, an alienist, to determine appellant's criminal responsibility during the period 1956 to 1964. Defense counsel represented that he did not at that time know whether or not there would be an insanity defense and opposed the application as premature. The court below ruled: "[I]n the face of a statement by respondent counsel that he himself does not know now whether on not insanity will be raised as a defense, I think it is far more prudent to deny your application."

On the third day of trial without any prior notice by defense counsel, Dr. Denker was called to testify on the criminal responsibility issue, as described above. At the close of Dr. Denker's direct examination, the Government renewed its motion to have appellant examined by Dr. Abrahamsen. Over defense counsel's objection, the application was granted.

The trial court also ordered the appellant "to cooperate fully with the examining psychiatrist and to answer each and every question put to him by the psychiatrist," adding "there is no privilege on the part of this defendant to decline to answer any question put to him by this examining psychiatrist," but Judge Wyatt was most emphatic in stating that he would limit the Government psychiatrist's testimony to the issue of criminal responsibility and would not permit the expert to repeat anything said to him by the defendant which bore on the issue of the defendant's guilt or innocence of the offenses charged. He said to counsel:

> "Failure to file the tax returns when required is conceded and is not at issue. The issue as to guilt or innocence, aside from that of mental disease or defect, is solely whether the failure to file was wilful, that is, a conscious, deliberate and intentional failure, as opposed to an unconscious, inadvertent, or negligence [sic] failure.

> "If any question is put to the doctor by the government as to what the defendant told the doctor and if an objection for the defendant is made to such a question, I will sustain the objection if the question relates to whether defendant's failure to file was wilful or not, and I will overrule the objection if the question does not relate to this issue. Drawing the line indicated may be extremely difficult, but I will attempt to do it."

Like Doctors Denker and Herman, Dr. Abrahamsen testified to statements made by the appellant during the psychiatric interview as the basis for his opinion that appellant was *not* suffering from a mental disease or defect.[7] But the trial

---

it over to the member of the firm who took care of these things.

 * * * * *

"I asked him about his reaction to when the lack of filing and payments were discovered, and he said he was very much taken by this, that this came as a surprise to him, that he didn't know what was happening during those years. This is the way he responded to this.

"The Court: I think I should say to the jury at this point that, of course, the testimony of the doctor as to what the defendant told him is no evidence of the truth of the statements made by the defendant; they are just offered here for whatever significance the doctor testifies they made on his opinion."

7. Examples of testimony which tended to corroborate the Government's proof on the wilfulness issue, admitted on the same theory relied on by the defense, discussed *supra*, are the following:

"He told me that during those years from 1954 or '58 to '64 he did a great deal of trading for himself.

 * * * * *

" * * * he told me that he had a personal checking account, that he wrote checks.

"He gave instructions to his bank about various things, and he wrote out on certain slips of paper the various things

judge was quick to prevent any testimony by Dr. Abrahamsen which directly concerned appellant's income taxes, even though both defense psychiatrists had been permitted to bolster the defense version of what had occurred. The following exchange took place:

"He [appellant] mentioned his tax difficulties about which he talked but I don't know whether I can say anything about that there.

"The Court: Don't tell us anything, Doctor, that he may have told you about his failure to file a tax return, just don't tell us anything about that. Anything else you may tell us."

Of course, as noted above, the trial court carefully instructed the jury that the out-of-court declarations were admitted solely to indicate the basis for the expert's opinion and were not evidence of the truth or falsity of the statements themselves.

The central issue raised on this appeal is the constitutionality of Dr. Abrahamsen's appointment and testimony at the trial. Specifically, the appellant argues that his Fifth Amendment privilege against self-incrimination was violated when the court (1) ordered him to submit to examination by a Government psychiatrist and to "answer fully all questions," and (2) then permitted the Government psychiatrist to testify as to those answers, with the exception of those concerning the accused's failure to file his tax returns. The appellant relies primarily on two cases, State v. Olson, 274 Minn. 225, 143 N.W.2d 69 (1966) and French v. District Court, Division 9, 153 Colo. 10, 384 P.2d 268 (1963). These cases are neither authoritative nor helpful in the decision of the case before us. In *Olson* the Supreme Court of Minnesota questioned the power of a court, absent statutory procedures with protective guidelines, to appoint an expert for the State to whose examination the accused was required to submit; and it also said, by way of dictum, that the accused could not be compelled to answer the State's alienist's questions under the penalty of a forfeiture of the defense of insanity. The question of the trial court's power in the present case is discussed below, and there was in this case no compulsion to cooperate under the sanction of losing the right to the defense of insanity. Moreover, the facts of *Olson* show that the State was seeking to have its psychiatrist examine the accused without the defendant having interposed the defense of insanity, though the court assumed that it would be raised.

In *French* the Supreme Court of Colorado held that it was error and a violation of the defendant's Fifth Amendment rights for the trial court to strike the defense of insanity entirely when the defendant refused to reply to interrogation by the State's expert. In the present case no such drastic sanction was even suggested.

In the present case the Government argues that "[b]y raising the defense of insanity, by submitting to psychiatric examiners of his own choosing and by presenting their opinions and his statements to them as the basis for their opinions in evidence, Baird made a *pro tanto* waiver of any Fifth Amendment privilege against self-incrimination." In support of its claim the Government cites three federal court decisions: Pope v. United States, 372 F.2d 710, 721 (8 Cir. 1967) (en banc), *vacated and remanded on other grounds*, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); Alexander v. United States, 380 F.2d 33, 39 (8 Cir. 1967); and United States v. Albright, 388 F.2d 719, 722–724 (4 Cir. 1968). *Pope* held that "by raising the issue of sanity, by submitting to psychiatric and psychologic examination by his own examiners, and by presenting evidence as to mental incompetency from the lips of the defendant and those examiners, the

which should be done with regard to various stock transactions.

"He also mentioned to me that he had had some real estate, and he sold this in the early 1960's he said, for $10,-000."

defense raised that issue for all purposes and that the government was appropriately granted leave to have the defendant examined by experts of its choice and to present their opinions in evidence." 372 F.2d at 721. While *Pope* is distinguishable from the case at bar because "Pope himself had taken the stand and had testified as to his lack of motivation, his urge to kill, and other aspects of his behavior which conceivably were pertinent to his defense," this did not constitute a concession by the defense that the Government had the right to have Pope examined by its own expert and to have his opinion admitted into evidence. This was done pursuant to an order by the court in the exercise of its power.

In *Alexander,* a case in which the defendant did not take the witness stand, an Eighth Circuit panel relied upon the en banc *Pope* decision as controlling authority. In addition to holding that the granting of leave to the Government to have its own expert examine the accused as to his mental capacity violated no right of the accused not to incriminate himself, the court also rested its decision on the concept of fair play in administering the adversary system.

> "It would violate judicial common sense to permit a defendant to invoke the defense of insanity and foreclose the Government from the benefit of a mental examination to meet this issue."

380 F.2d at 39.

In *Albright,* the third federal decision relied on by the Government, the defendant's guilt was conceded and criminal responsibility was the only issue in the case. The defense of mental incapacity was first claimed at the opening of the trial. The court permitted the Government to have its alienist examine the accused and testify. The Court of Appeals held that defendant's privilege against self-incrimination was not thereby violated because nothing reported by the expert in his testimony as having been said to him by the defendant was introduced into evidence on the issue of the defendant's guilt of the offense charged. The court also ruled that such an examination and testimony by an expert for the Government should be allowed as a matter of fairness in view of the burden of proof resting on the Government and because of the advantages of expert opinion evidence.[8]

■ While these cases in general support the Government's position, we are not persuaded to adopt the Government's "pro tanto waiver" theory. Instead, we conclude that the defendant's election to place in evidence expert opinion testimony, based upon defendant's own statements to the alienist whose qualification to testify rested upon those statements, which were made subsequent to the commission of one of the criminal acts charged, estopped the defendant from objecting to a like examination of the accused by the Government's expert and the admission into evidence of his opinion testimony. Therefore, we will discuss the question of self-incrimination from the nature of the evidence sought to be adduced with respect to both the criminal responsibility and the wilfulness questions.

At the outset it must be emphasized that the present case concerns only the testimony of alienists who examined the accused subsequent to the criminal act, or subsequent to the earliest of a number of criminal acts, charged. The decision does not, therefore, pertain to cases where the defense presents the expert testimony of an alienist who examined the defendant *for treatment* prior

8. E. g.:
 "The maintenance of a 'fair state-individual balance' clearly required that the government be permitted to have defendant examined." 388 F.2d at 724.
 And further:
 " * * * we would unduly limit the ability of a court to find the truth in a criminal case where sanity is an issue were we to turn our backs on the tool of expert medical knowledge. Rather, the use of expert medical opinion is to be encouraged." *Id.* at 723.

to the commission of any of the criminal acts in question and whose opinion is based on consultations with the accused during the period prior to the occurrence of such offense.

It should also be pointed out that the exclusion of the testimony of the defense expert who had examined the accused subsequent to the offense in preparation for trial as a sanction because the accused refused to submit cooperatively to an examination by the Government's expert, would by no means bar the interposition of the defense of mental disease or defect. It would still be open to the accused to present evidence of his own past behavior, of a family history of mental impairment and other relevant circumstances of his life, and alienists would still be afforded an opportunity on his behalf to give their opinions on his mental state or condition from hypothetical questions based on assumptions from evidence in the case.

The present case concerns a very special situation dealing with expert opinion put into evidence before the trier of a criminal case and based upon the expert's private examination and interrogation of the accused. The defense claims that its expert may repeat in his testimony everything the accused said to him, which may include matter designed to be completely exculpatory of the defendant on the issue of guilt, even though the defendant elects not to take the witness stand. There has, as yet, been no decision which, on constitutional or other grounds, exempts witnesses for the defense, where the defendant himself does not testify from the operation of the hearsay rule, in order that witnesses may testify to anything or everything the defendant said including a full statement of what he would like to say in his defense without exposing himself to cross-examination. Baird circumvents this obstruction by asserting that he does not claim that his story, thus testified to by the experts, is to be taken as true; what he does claim is that his doctors' repetition on the witness stand of what Baird told them during the examinations are admissible as verbal acts on which the doctors' opinions are based, but not for the truth or falsity of what Baird told them, and, therefore, they are within a recognized exception to the hearsay rule. But the defense goes on to claim that the Fifth Amendment to the Federal Constitution bars the examination of the accused by an alienist for the Government, in which cooperation by the accused is required, beause the defendant would thereby be compelled to testify against himself even though the Government does not claim the truth of what the accused said to its expert, but like the defense, treats such statements as verbal acts; and even though the Government does not seek to use anything said by the accused on the issue of guilt or innocence of having committed the offense charged.

We conclude, however, that where under such circumstances the defendant puts in evidence the opinion testimony of his expert, the Government has the right to have its expert examine the accused and to put in evidence his opinion testimony in rebuttal, and that the exercise of such right by the Government does not infringe the defendant's right against self-incrimination.

These issues relating to the defense of insanity were before the Supreme Court of New Jersey in State v. Whitlow, 45 N.J. 3, 210 A.2d 763 (1965). It said,

"It is obvious, even to the layman, that in all probability a psychiatrist would require more than a mere physical examination of a defendant in order to reach a conclusion of his sanity or insanity. The very nature of the psychiatric study would seem to call for utterances, or answers through conversation with the alleged incompetent. The psychiatric interview is the basic diagnostic tool."

\* \* \* \* \* \*

"There seems to be a tendency elsewhere in insanity cases to allow the defense psychiatrist to recount the full history obtained from the defendant regardless of its hearsay or self-serving quality, so long as the doctor regards it as essential to the formulation

of his expert opinion. If he so regards the history, the test of admissibility is satisfied. The thesis is that such conversations with and statements by the defendant, whether or not they relate to the crime itself, are verbal acts; circumstantial evidence for or against the claim of insanity. They do not come in as evidence of the truth of the facts asserted but rather, and only, as part of the means employed by the doctor in testing the accused's rationality, mental organization and coherence. They are object-like factors used to ascertain mental abnormality or the reverse."

210 A.2d 769–771.

■ The statements which the defendant makes to the psychiatrist may be as vital for diagnosis as an x-ray or a blood test may be to a physician in another context; this was the theory of admissibility upon which appellant relied in having his expert witnesses recount otherwise inadmissible self-serving, hearsay statements; and, even though they are verbal, they may be considered as "real or physical evidence" rather than as "communications" or "testimony" within the meaning of Schmerber v. California, 384 U.S. 757, 763–764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) in which the Supreme Court said:

"It is clear that the protection of the privilege reaches an accused's communications, whatever form they might take, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. On the other hand, both federal and state courts have usually held that it offers no protection against compulsion to submit to fingerprinting, photographing, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture. The distinction which has emerged, often expressed in different ways, is that the privilege is a bar against compelling 'communica-tions' or 'testimony,' but that compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate it." (Footnote omitted.)

*Schmerber* did not make the communications—real evidence dichotomy absolute. While noting that "this distinction is a helpful framework for analysis," the Court foresaw that "[T]here will be many cases in which such a distinction is not readily drawn."

■ Appellant took full advantage of the theory of admissibility which treated his out-of-court statements as real evidence rather than as hearsay; in effect, he asked the trial court to hold that there was no communicative aspect to his evidence, outside of its use as a basis for the opinions of the alienists. The same theory and the rule of evidence should be available to the Government, once the defense has been interposed and the defendant offers the expert opinion testimony of one who examined him after the commission of a criminal act charged. To rule that the Government's alienist may examine the accused and give his opinion testimony of the accused's mental condition does not rest upon or involve a waiver by the defendant of some known right of his, although it may be argued that this is just another way of saying the same thing. It is more accurate to say that a defendant who raises a defense based on criminal responsibility is estopped from making an effective objection to the Government's proceeding in this fashion when he, himself, has relied upon the same evidence-admissibility theory under circumstances such as those in the present case.

■ The same reasoning applies to the use of the testimony of experts in relation to the insanity defense as it bears on the issue of wilfulness and the defendant is faced with the same estoppel. As the failures to file the returns were conceded by the defense, the only challenged element of the offenses was that of wilfulness. The defense of mental disease or defect, was, therefore, par-

ticularly directed toward wilfulness. As both the insanity defense and wilfulness involve a state of mind, the trial court's effort to keep out of the testimony of the Government's expert anything which the accused had told the expert in the out-of-court examination, which tended to show his guilt or innocence of the offense, called for particular care on the part of the court, which it fully and properly exercised. The appellant complains that the trial court was unable to keep Dr. Abrahamsen's testimony confined to reporting what the accused said or did which bore solely on the opinion of the presence or absence of mental disease or defect. He cites Dr. Abrahamsen's comment that Baird was evasive and asserts that this was tantamount to saying Baird was wilful. But Dr. Abrahamsen was not called upon to give an opinion as to whether or not Baird acted wilfully nor did he do so. He was concerned only with Baird's mental capacity to form a wilful intent and to exercise it, not whether he had done so with regard to the offenses charged.

Out of a superabundance of precaution Judge Wyatt refused to admit into evidence any report by Dr. Abrahamsen of any statement by the accused Baird which related to Baird's guilt or innocence of the offense charged even though such a statement would be treated as a verbal act and used and claimed only as part of the basis for the expert's opinion. Other courts which have recognized the right of the Government to have its expert examine the defendant and thereafter give opinion testimony as to the defendant's mental capacity have not been that strict. In *Whitlow*, for example, the grounds for the alienist's opinion included "statements of the accused about his crime * * *." As the trial court in the present case excluded from the evidence the report of any such statements, the appellant clearly suffered no prejudice even if the jury had difficulty in treating the statements of the defendant to the Government's expert as verbal acts only.

The appellant also argues that, quite apart from the self-incrimination issue, the District Court was without power to order him to submit to a psychiatric examination. However, in United States v. Driscoll, 399 F.2d 135, 139 (2 Cir. 1968), this court said that "a strong case can be made for the existence" of a power in the district court to order a psychiatric examination of a defendant under circumstances such as those in the case at bar. The court cited as authority Pope v. United States, *supra*, Alexander v. United States, *supra*, and United States v. Albright, *supra*, all of which hold that such inherent power exists in the district court. Accord: Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326, 328 (1959).

 Union Pac. Ry. v. Botsford, 141 U.S. 250, 11 S.Ct. 1000, 35 L.Ed. 734, (1891), and Sibbach v. Wilson & Co., 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), relied on by appellant, are not in point. *Botsford* was concerned with common law limitations on the power of courts to order physical examinations of plaintiffs in *civil* cases. *Sibbach* dealt with the issue of whether Congress had properly authorized the Supreme Court to prescribe a rule of civil procedure which gave to district courts the power to order physical examinations in *civil* cases. A federal court has the responsibility to supervise the administration of criminal justice in order to ensure fundamental fairness. Cf. McNabb v. United States, 318 U.S. 332, 340, 63 S.Ct. 608, 87 L.Ed. 819 (1943) ("Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and justice."); Fed. R.Crim.P. 28 and 57(b). We are satisfied that the order of the court below furthered the interests of justice, and we hold that the authority to permit the Government to examine the accused under the circumstances in the case at bar stems from the inherent power of the courts in criminal cases.

 Following the trial court's granting the Government's motion for leave to

have its expert examine Baird, the defendant requested that his counsel be present at the examination or that a stenographer transcribe the interview. These requests were denied, but the court ordered that the Government give a copy of any report of the examination by its alienist to defense counsel. The appellant argues that the denial of his requests deprived him of his Sixth Amendment constitutional right to have the assistance of counsel at a critical stage of the proceedings against him. He bases his claim on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), which held that a suspect had a right to have his counsel present at a police line-up at which the suspect was sought to be identified.

The facts of the present case, however, do not fit the *Wade* rationale nor is the presence of counsel called for. Bearing in mind that the purpose of the examination was to qualify the Government's expert and furnish him with a basis for an opinion as to the accused's mental condition to which the expert could testify at the trial; that statements made to him by the accused could not be used on the issue of guilt or innocence of committing the offenses and were to be treated only as verbal acts from which the expert's opinion was drawn; and that the accused had no privilege to refuse to answer the alienist's questions, the examination did not constitute the kind of critical stage in the proceedings at which the assistance of counsel was needed or at which counsel could make a useful contribution. In fact, the presence of a third party, such as counsel or a stenographer, at such an examination tends to destroy the effectiveness of the interview. Cf. Thornton v. Corcoran, 407 F.2d 695 at 702, also dissenting opinion at page 705 and opinion dissenting from order, page 711 (D.C.Cir.1969); State v. Whitlow, *supra,* 210 A.2d at 776.

The trial court gave the notice and warning to the defendant, as required in United States v. Driscoll, *supra,* that the psychiatrist who was to examine him might testify against him in court. The appellant has not suggested that the examination was abused by seeking to extract from him damaging admissions on the issue of guilt or innocence.

The *Wade* decision rested in part on a possible impairment of the defendant's Sixth Amendment right to be confronted with the witnesses against him. But in the present case the right of cross-examination was protected, and defense counsel, who was skilled in the presentation of psychiatric testimony, had access to the notes of the Government's expert. Counsel was given ample time to consult the defense psychiatrists even to the point of being granted an adjournment so that he might consult with them. While arguing generally the possibility of prejudice, neither at the trial nor before this court has defendant claimed that the Government witness distorted or misrepresented what occurred at the interview. Rather the cross-examination was confined, as might be expected, to challenging the expert's opinions, not their testimonial basis. We are not persuaded that the procedure itself harbors substantial dangers; and, without a more adequate and less speculative showing of actual prejudice, we are not tempted to forge new constitutional rules. In the words of *Wade,* the "hazards of serious unfairness to the criminal accused" have not been shown.

In approaching the matter of possible prejudice, implicit in the procedure, Wade, 388 U.S. at 227, 87 S.Ct. at 1932, calls for a scrutiny of prosecutorial confrontations to determine "whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice." Neither prong of that test has been satisfied in the present case.

First, the psychiatric interview conducted here was not the kind of pre-trial prosecutorial confrontation that *Wade* dealt with. See United States v. Driscoll, 399 F.2d 134, 141 (2 Cir. 1968) (dissenting opinion). It was not part of the investigative and identification process, preceding arrest, aimed at ferreting

out the guilty, suffused with the risk of police abuse and the possibility of implicating the innocent. The interview became necessary only after defendant had raised the issue at trial by his sudden, unannounced injection of the defense of mental incompetency. Since the insanity defense is hardly a spontaneous trial tactic but rather a carefully considered course arrived at only after detailed preparation and studied consultation with the psychiatric experts, the "confrontation" was one brought about deliberately by the defendant—not by the Government. See generally, A. S. Goldstein, The Insanity Defense (1967).

There is not, moreover, the widespread distrust of psychiatric examinations that there is of eye-witness identifications made under marginal circumstances of reliability, nor does the psychiatric interview have the inculpatory impact of a police line-up or show-up. With the safeguards and limitations placed on the use of the testimony given by the Government's expert, there was no recognizable self-incrimination problem. Of course, no one can say it is not possible that such a problem may exist. But if the defense has knowledge of something unknown to the Government and the court which, if disclosed to a Government alienist, might risk grave damage to the defendant's case through its revelation to the prosecution, innocently or otherwise, defense counsel should seek a protective order from the court in advance of the examination. It is also possible in an unusually delicate situation that the defense would elect to withdraw its offer of the opinion testimony of its own expert based upon examination of the accused, or submit to having such testimony stricken if it is already in the record. The defendant has no absolute constitutional right to put in this specific kind of testimony; and if he does not, the Government cannot, for it has nothing to test or rebut. The defense of insanity can still be proven from all of the other kinds of evidence which may be adduced to show the past history of the accused and everything that might be relevant to his mental condition at the time of the offense charged, and expert opinion testimony could be presented, based upon such evidence.

Appellant next argues that by instructing the jury that there was no claim of present mental disability, in the context of a defense claiming progressive mental illness, the court below effectively deprived him of his defense of lack of criminal responsibility. The disputed language follows:

"Defendant contends as to all five counts that on and before the April 15th dates in the years when he was required to file returns, namely, April 15 of 1960 through 1964, he was insane as the law defines insanity. The time of the claimed insanity is of importance. It is not claimed that the defendant is presently suffering from any mental disability, but, rather, that he was insane at the time of the alleged offenses."

We do not think that this instruction could have prejudiced the appellant; indeed, the instruction was apparently designed to protect appellant from any immaterial inferences which the jury might draw from appellant's presence and actions in the courtroom.

Appellant claims that the trial court also erred in excluding, "early in the trial, all evidence as to defendant's present mental state." The ruling complained of occurred before the mental competency defense had been raised, and it only barred evidence of the appellant's present *physical* disorders. This ruling in no way limited or circumscribed the defendant's defense that because of mental disease or defect he was not criminally responsible during the period from 1957 through 1964.

The appellant also contends that the use of the term "insanity" by the court in its charge and by Government counsel in his summation constituted prejudicial error where defense counsel had assiduously avoided using the term. In his charge, Judge Wyatt stated that appellant claimed to have been "insane as

the law defines insanity." In the next paragraph he explained:

"There is controlling authority for the proposition that the terms 'insane' and 'insanity' should nowadays be replaced by the expression 'mental disease or defect.' When I used the old terms 'insane' and 'insanity,' I did not mean to convey to you any impression different from that conveyed by the words 'mental disease or defect.' I used the older terms only as an introduction to the subject."

He then immediately instructed the jury in the terms required by United States v. Freeman, *supra.* We find no error in this portion of the charge. Nor was the prosecutor's one mention of the word "insanity" in a three-hour summation fatally prejudicial. The trial court rejected a defense objection that there was in the case no contention of insanity with the following statement: "There is a contention of insanity as the law defines that term, and I will explain to the jury tomorrow." The court's subsequent charge was sufficient to cure any confusion or misconception which the jury may have had.

 Appellant's final contention is that a new trial should be ordered because of the prosecutor's misstatement in argument, which implied that the only penalty upon conviction would be a fine. At the end of his half-day summation culminating a two-week trial, the defense counsel stated:

"Now, please consider the case carefully. You have the power—you have the power, no question about it—to end what is left of my client's life or you can take him to the door and you can deliver him to life and freedom. The power is divine, the power is your power, it isn't anybody else's power."

This statement improperly called the jury's attention to the issue of punishment, and, if taken literally, suggested the pos-

sibility of the death penalty or perhaps life imprisonment. The Assistant United States Attorney was apparently provoked by this excess into making a false implication on his own part; at the beginning of his summation he stated:

"What I have said is important because only Judge Wyatt, and only Judge Wyatt by his experience and his eminence, can decide what should be done, if anything, with Earl Baird, whether or not Earl Baird should be fined or whether or not Earl Baird shall not be fined. That is not for you to concern yourselves with, nor is it for me. I am not the judge—"

Defense counsel immediately objected, and the trial judge replied at once:

" * * * I am going to tell the jury, and I will tell them now, that the jury is not to concern itself in any way, shape or form with the defendant's punishment. That is solely for the court."

In his subsequent charge, the trial judge stated:

"The jury is not to consider or in any way speculate about the punishment which the defendant may receive if he is found guilty, whether imprisonment or fine or both or neither, that is, a suspended sentence. The function of a jury is to determine the guilt or innocence of the defendant on the basis of the evidence in the light of these instructions. It is the Judge alone, the Court, who has the duty of determining the punishment if there is a conviction."

We hold that Judge Wyatt's careful and ample instructions corrected any misunderstanding the jury may have entertained from the misleading statements of counsel and no prejudice to the defendant could have resulted.

There is no error and the judgments of conviction are affirmed.