UNITED STATES of America,
Appellee,

v.

Sean McSHERRY, Defendant–
Appellant.

Docket No. 99–1749.

United States Court of Appeals,
Second Circuit.

Filed: April 26, 2000.

Decided: Sept. 22, 2000.

Diarmuid White, New York, N.Y. (Brendan White, New York, N.Y. on the brief) for Defendant–Appellant.

Timothy A. Macht, Assistant United States Attorney, Brooklyn, N.Y. (Loretta E. Lynch, United States Attorney for the Eastern District of New York, David C. James, Assistant United States Attorney on the brief) for Appellee.

Before: JACOBS, LEVAL and SACK, Circuit Judges.

JACOBS, Circuit Judge:

Sean McSherry appeals from a judgment of conviction entered following a jury trial in the United States District Court for the Eastern District of New York (Gershon, *J.*), convicting McSherry on six counts of perjury in violation of 18 U.S.C. § 1623, one count of making false statements to a federal official in violation of 18 U.S.C. § 1001, and one count of obstruction of justice in violation of 18 U.S.C. § 1503. Two issues raised by McSherry on appeal are rejected in an unpublished summary order also filed today. *See United States v. McSherry*, 226 F.3d 153 (2d Cir.2000). This opinion considers McSherry's claims that the district court erred by (1) requiring McSherry either to undergo a mental examination by government doctors or to forego expert testimony concerning his mental condition as a defense at trial, and (2) granting a three-level sentencing enhancement for perjury and obstruction of justice that "resulted in substantial interference with the administration of justice" pursuant to Sentencing Guidelines §§ 2J1.2(b)(2) and 2J1.3(b)(2). We reject the first claim but grant the second, and remand for re-sentencing.

## BACKGROUND

We recount only the facts that bear upon the issues discussed in this opinion. Sean McSherry, a New York State Parole Officer, was indicted on October 6, 1998, on charges arising out of his testimony before a federal grand jury investigating whether certain decisions by the New York State Division of Parole ("DOP") were influenced by election campaign contributions. At the time of his indictment McSherry was a New York State Parole Officer. McSherry's grand jury testimony concerned a 1996 parole hearing at which McSherry was lead commissioner and at which a decision was made to release inmate John Kim. The indictment charged that McSherry willfully lied before the grand jury about what transpired before and during Kim's parole hearing.

In his role as lead commissioner at the 1996 hearing, McSherry asked Kim, *inter alia*, whether his family was wealthy, and added,

> Don't laugh. Hey, don't smile yet kid. You're not out of the door yet and we … haven't made up our mind. All right, but if we grant you parole and you come back, I don't care how much money your daddy's got, who he writes letters to or what lawyers he writes to or has working for you, you're going back for an extensive period of time.

Investigators later determined that Kim's father and associates had donated over $3,000 to the gubernatorial campaign of

New York Governor George Pataki. McSherry told the grand jury that he had no knowledge of these payments or that anyone from the Governor's office was interested in the Kim case.

The indictment charged that McSherry lied to the grand jury about a number of matters, including (1) how he came to be lead commissioner on the Kim case; (2) his comments concerning Kim's wealth; (3) whether other parole officers voiced disagreement with Kim's release; (4) discussions among parole commissioners about postponing the Kim case; and (5) his failure to recollect the Kim case when initially questioned by detectives. He was not charged with misconduct in his duties as a parole commissioner.

Following indictment, McSherry gave notice pursuant to Fed.R.Crim.P. 12.2 of his intent to introduce expert testimony "relating to a mental condition that has bearing on whether the defendant had the requisite mental state required for commission of the crimes charged in the Indictment." McSherry gave the government cross-referenced reports by one psychologist and one psychiatrist setting forth: the methodology of tests administered on McSherry; the test results; summaries of McSherry's statements and behaviors during his examination; opinions and diagnoses as to McSherry's mental condition; and the grounds for the opinions and diagnoses. The government moved for an order compelling McSherry to submit to a mental examination by prosecution experts. Eight weeks before trial, the district court ruled that McSherry's use of his own experts at trial would be conditioned on McSherry submitting himself to an independent psychiatric examination by prosecution experts. McSherry refused to be examined by government experts and withdrew his notice that experts would testify on behalf of his defense.

After a two-week jury trial, McSherry was convicted on all counts. He was sentenced to a 24-month term of imprison-ment, to be followed by two years of supervised release, a $5,000 fine and an $800 special assessment.

## DISCUSSION

### A. *Mental Examination*

■ The district court premised its conditional order compelling a psychological examination on both Fed.R.Crim.P. 12.2 and on its inherent supervisory powers over the administration of criminal justice. McSherry argues that Rule 12.2 is the exclusive source of a court's power to order a psychological examination of a criminal defendant, and that the order issued in this case is not explicitly sanctioned by that rule or by the rules referenced therein. We need not decide whether the order in this case was expressly sanctioned by Rule 12.2, because we conclude (1) that that Rule is not an exclusive source of the power to order a mental examination; (2) that the Rule does not extinguish a trial court's inherent power to order a mental examination under appropriate circumstances, and (3) that the district court in this case properly exercised that inherent power.

■ " 'Guided by considerations of justice, and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress.' " *United States v. Johnson*, 221 F.3d 83, 96 (2d Cir.2000) (quoting *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983)). One of the purposes of this inherent power is "to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury." *Id.* (citation omitted); *see also Daye v. Attorney General of New York*, 712 F.2d 1566, 1571 (2d Cir.1983) ("[F]ederal courts have authority under their supervisory powers to oversee the administration of criminal justice within federal courts."); *United States v. Cannone*, 528 F.2d 296, 298 (2d Cir. 1975) ("It would be ill-advised to limit im-

providently this inherent power for fear of misuse. The firing point of the legal system is with the trial judge who is best situated to administer the law and protect the rights of all."). This power is not impliedly preempted or extinguished by a procedural rule that covers some of the same ground. *See* Fed.R.Crim.P. 57(b) ("A judge may regulate practice in any manner consistent with federal law, these rules, and local rules of the district."). The Supreme Court has admonished, however, that resorting to inherent power must "be a reasonable response to the problems and needs that provoke it." *Degen v. United States,* 517 U.S. 820, 823–24, 116 S.Ct. 1777, 135 L.Ed.2d 102 (1996) (citations omitted).

■ The district court, in the alternative, invoked its inherent authority to order that McSherry undergo an exam by prosecution experts before relying on his own experts at trial: "On the facts of this case that are before me, I find that there's no realistic way for the government to address the proposed expert testimony of the defense without an examination of the defendant." The court emphasized that under the particular circumstance of McSherry's notice, the testimony of his expert witnesses was to be "based solely on what the experts were told by the defendant."

■ Those facts justify an exercise of inherent powers. Before the promulgation of any rules on the matter, we held that if the defense relies on expert testimony as to the defendant's mental state, it is estopped from depriving the government of an opportunity to examine the defendant:

> [W]e conclude that the defendant's election to place in evidence expert opinion testimony, based upon defendant's own statements to the alienist whose qualification to testify rested upon those statements, which were made subsequent to the commission of one of the criminal acts charged, estopped the defendant from objecting to a like examination of the accused by the Government's expert

and the admission into evidence of his opinion testimony.

*United States v. Baird,* 414 F.2d 700, 707 (2d Cir.1969). *Baird* recognized that the "authority to permit the Government to examine the accused under [these circumstances] ... stems from the *inherent power of the courts in criminal cases." Id.* at 710 (emphasis added). It does not matter whether the defendant's expert was offered to support an insanity defense or to challenge the willfulness element of the crime. *See id.* at 709–10.

Since *Baird,* courts have reaffirmed orders requiring a psychiatric examination on the basis of a federal court's inherent power to "supervise the administration of criminal justice in order to ensure fundamental fairness." *Id.* at 710; *see United States v. Webster,* 162 F.3d 308, 339 (5th Cir.1998) ("Although ... the court lacked statutory authority to order the psychiatric exam, a district court possesses inherent powers reasonably useful to achieve justice.") (internal quotation marks omitted); *United States v. Davis,* 93 F.3d 1286, 1295 (6th Cir.1996) ("[T]he statutes and rule do not displace extant inherent authority to order a reasonable, noncustodial examination of a defendant under appropriate circumstances."); *United States v. Phelps,* 955 F.2d 1258, 1265 (9th Cir.1992) (inherent authority to compel examination to determine whether defendant should be released after verdict of not guilty by reason of insanity); *Gibson v. Zahradnick,* 581 F.2d 75, 78 (4th Cir.1978) (inherent authority to order examination regarding sanity at time of the offense); *United States v. Green,* 544 F.2d 138, 145 (3d Cir.1976) (court possesses inherent power to appoint its own psychiatrist to determine defendant's competency to stand trial); *United States v. Weiser,* 428 F.2d 932, 935–36 (2d Cir.1969) (inherent authority justifies court's power to order psychiatric examination).

We therefore conclude that the exercise of inherent power was reasonable in this

case. McSherry gave notice that he intended to rely on the opinions of two experts—one psychiatrist and one psychologist—as to his mental state at the time of the charged conduct. Both experts had arrived at their diagnoses after prolonged examinations of the defendant. The district court order afforded the government no more than rough parity in terms of access to the information that would allow the government's experts to arrive at competing conclusions. As another circuit has noted, "[o]rdinarily the only effective rebuttal of psychiatric opinion testimony is contradictory opinion testimony; and for that purpose ... the basic tool of psychiatric study remains the personal interview, which requires rapport between the interviewer and the subject." *United States v. Byers*, 740 F.2d 1104, 1114 (D.C.Cir.1984) (en banc) (plurality opinion) (internal citation and quotation marks omitted). Accordingly, on the facts before the district court, it was a reasonable exercise of inherent power to condition the defendant's use of expert opinion testimony upon his examination by prosecution experts, who could then testify as to their own observations and evaluations.

Nothing in Rule 12.2 can be read to supplant the inherent authority exercised here by the trial court. Even if McSherry were correct that Rule 12.2 does not *confer* that power (a point as to which we express no view), we see no basis for abrogating a power long recognized by this Court and others to inhere in courts' supervisory authority over the administration of criminal justice. *See, e.g., Webster*, 162 F.3d at 339 (recognizing that regardless of whether court lacks "statutory authority" to order examination, there is no error where court-ordered examination is a reasonable exercise of "inherent powers"); *Davis*, 93 F.3d at 1295 (finding no statutory authority to order 45–day committal for purposes of psychiatric examination, but allowing that a district court may have "inherent authority" to do so under reasonable circumstances); *United States v. Lewis*, 53 F.3d 29, 35 n. 9 (4th Cir.1995) (court did not err

in ordering examination in light of defendant's stated intent and his notice pursuant to Rule 12.2 to rely on claim of subnormal intelligence).

### B. *Sentencing Enhancement*

■ The district court imposed a three-level enhancement under Guidelines §§ 2J1.2(b)(2) and 2J1.3(b)(2) for offenses resulting in "substantial interference with the administration of justice." McSherry argues on appeal that these enhancements were improperly applied. We agree.

■ Legal interpretations of the Sentencing Guidelines are reviewed *de novo, see United States v. Chacko*, 169 F.3d 140, 150 (2d Cir.1999); factual findings supporting the court's offense calculation are reviewed for clear error. *See United States v. Koh*, 199 F.3d 632, 642 (2d Cir.1999).

Sentencing Guideline 2J1.3(b)(2) provides for enhancement where "perjury ... resulted in substantial interference with the administration of justice"; Guideline § 2J1.2(b)(2) provides the identical enhancement for "obstruction of justice" where "the offense resulted in the substantial interference with the administration of justice." The question is whether the offenses of conviction (perjury and obstruction of justice) had such a result in this case.

The district court cited *United States v. Amer*, 110 F.3d 873 (2d Cir.1997), and found that McSherry's false testimony "substantially impaired the administration of justice in New York State Parole proceedings." The court reasoned that the "[t]he public at large, as well as those directly involved, that is the inmates and the victims of crimes, are entitled to have confidence in the integrity of parole release proceedings" and that the Department of Parole had "received petitions from inmates who had been denied release by Mr. McSherry seeking new hearings."

■ In the absence of persuasive reasons to the contrary, terms in the Guide-

lines are given their ordinary meanings. *See Chapman v. United States,* 500 U.S. 453, 461–62, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (referring to plain dictionary meaning to construe "mixture" and "substance" under the Guidelines); *United States v. Rodriguez–Lopez,* 170 F.3d 1244, 1245 (9th Cir.1999) (per curiam) (looking to ordinary meaning to interpret "criminal conviction" contained in Guideline 2L1.2(b)). The dictionary defines the verb "result" to be causational: "to proceed, spring, or arise as a consequence, effect, or conclusion." *Webster's Third International Dictionary Unabridged* 1937 (3d ed.1996); *see also Random House Dictionary of the English Language* 1223 (defining result as "to proceed, spring, or arise as a consequence, effect or conclusion from actions, circumstances, premises, etc.; be the outcome."). But it is not altogether clear from the dictionary how direct or proximate a resultant consequence must be; nor is it obvious how substantial must be the "substantial interference with the administration of justice." This is a problem because the results identified by the district court—diminished respect for the parole system and an increment in petitions within it—are at best generalized and attenuated influences of McSherry's false testimony before the grand jury.

To better understand Guidelines §§ 2J1.2(b)(2) and 2J1.3(b)(2), we turn to Application Note 1, which is made applicable to both, and which furnishes a list of informative and suggestive examples:

> "Substantial interference with the administration of justice" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

U.S.S.G. § 2J1.2, comment (n.1); § 2J1.3, comment (n.1). This is a list of discrete impacts causing the miscarriage or the misdirection of resources in an identifiable initiative or proceeding. And while this list is "not exclusive," it accommodates "other acts" only if they are "similarly or even more disruptive of the administration of justice." *Amer,* 110 F.3d at 885.

No doubt the exposure of a corrupt parole commissioner will tend to erode the public's "confidence in the integrity of parole release proceedings." And inmates previously denied parole may well ask for new hearings (which are free). These consequences would appear to result from the corruption itself. But McSherry was not convicted of corrupt acts; the offenses of conviction here are the commissioner's efforts to cover his tracks.

At oral argument we asked the government to clarify exactly how it was that McSherry's false testimony (as distinguished from his frailty of character generally) "resulted" in a "substantial interference with the administration of justice." The government provided the following transcript excerpt of its trial examination of Terrence Tracy, counsel for the New York State Division of Parole.

> Q: Since Mr. McSherry was indicted in this case, you have received quite a number of petitions, have you not, from inmates who were denied release by Mr. McSherry's indictments as a reason from them to get a new hearing?
>
> A: That's correct.
>
> Q: And you have had to respond to those?
>
> A: Yes, I have.
>
> . . .
>
> Q: If Mr. McSherry is convicted, you will get many more petitions from inmates, wouldn't you?
>
> A: Yes, I will.
>
> Q: You will have to take the time to respond to them?
>
> A: Yes, I will.

This is unhelpful. We accept that the administration of parole in New York was burdened in some general ways by the publicity surrounding this investigation.

And the record establishes that McSherry's indictment did not help matters. But this does not constitute the requisite showing that McSherry's testimony before the federal grand jury—the only basis for the offenses of conviction—resulted even in such generalized effects. Mr. McSherry was not indicted for being improperly influenced or corrupt; he was indicted for (in the government's view) *denying* before a federal grand jury that he was improperly influenced or corrupt.

The short refutation of the government's position is that if McSherry's grand jury testimony had been truthful, and had confirmed the government's version of events—that is, if McSherry did not commit the crimes of which he was convicted—no different result could be foreseen for the administration of justice. McSherry's truthful testimony would then have confirmed the government's view that the parole system misfired or was corrupted. In that event, one could anticipate the same disenchantment with the parole system and just as many (probably more) petitions flooding the parole board. We therefore conclude that McSherry's testimony before the grand jury—the only crimes of conviction—did not "result[ ] in substantial interference with the administration justice." Without evidence supporting that link (and we find none) there is be no basis for enhancement in this case.[1]

*Amer* is not to the contrary. In that case we affirmed the district court's application of Guidelines § 2J1.2(b)(2) to a defendant convicted of abducting his three children from his estranged wife's apartment and removing them to Egypt with the intent to obstruct the wife's right to physical custody. In applying the enhancement, the district court stated, as quoted in *Amer*:

> [The defendant's] conduct ... was[,] by analogy, more egregious than that referred to in [Application Note 1], because rather than terminating a judicial proceeding by his actions, he made certain that the action was one that would never be commenced. It is a situation in which he deemed himself the judge, and then he made the decision.... The defendant ... wholly ignored the lawful process, and acting in the form of a vigilante, if you will, took matters into his own hands.

110 F.3d at 885 (first bracketed material added; remaining bracketed material and ellipses in original). Upholding the enhancement, we noted that "[a]lthough the abduction did not interfere with an ongoing proceeding, *this act* prevented proper legal proceedings from occurring by taking matters completely outside the purview of the administration of justice." *Id.* (emphasis added). In other words, the crime of conviction (abducting the children) prevented and frustrated an identifiable and anticipated legal proceeding.

The societal harm caused by McSherry's false testimony before the grand jury is already reflected in the base offense levels for the crimes of conviction, and there is no basis under Guidelines §§ 2J1.2(b)(2) and 2J1.3(b)(2) to increase those levels for attenuated consequences that (if they occurred) did not result from the charged conduct.

## CONCLUSION

The case is remanded for re-sentencing consistent with this opinion.

---

1. We do not consider the possibility (which is not presented on appeal) that the increase might be justified on some alternative basis. Conceivably, a public official who lies to a grand jury and thereby misdirects the grand jury's inquiry may be said to "substantial[ly] interfere with the administration of justice."