**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**William Herbert GREENE, III,**
**Defendant-Appellant.**

**No. 72–1939.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1973.

Decided June 4, 1974.

Mildred G. Peters, Northfield, Ill., Robert S. Bailey, Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Glynna W. Freeman, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, PELL, and STEVENS, Circuit Judges.

PELL, Circuit Judge.

Defendant William Herbert Greene, III appeals from his conviction for air piracy. The basic facts involved in the incident are not disputed by defendant. On April 17, 1972, Greene boarded a Delta Airlines airplane [1] en route from West Palm Beach, Florida to Chicago, Illinois. When the airplane was in flight, defendant passed a stewardess a note reading:

"I have a gun When we land in Chicago want $500,000.00 cash small bills Refuel plane for enough to go to Nassau Bahamas Act normal! Bring money before anyone gets off plane"

The copilot, Boyd, spent the remainder of the flight talking to Greene about these demands. Boyd explained to Greene the time that would be necessary to unload the passengers, refuel, and obtain the $500,000. The defendant agreed to allow the stewardesses as well as the passengers to disembark in Chicago and keep on the plane only the male crew members. Greene permitted Boyd to return to the cockpit to assist in the landing of the plane. As soon as the plane was on the ground, Boyd returned to sit next to defendant. Boyd told Greene that he had two choices: to go to Nassau or to give up now. Greene agreed to give up, whereupon the two men left the plane and defendant was arrested.[2]

---

1. Delta's advertising presumably had an unintended appeal. Greene's decision to take the flight and skyjack the airplane was inspired by a sign he saw near the airport, reading "Delta is ready when you are."

2. While the defense does not contend that the acts in question did not occur, they do mention, during the course of argument, that

we are dealing with a crime which defendant could not possibly have consummated successfully because he had no weapon. Greene was not charged with the illegal possession of firearms. His note claimed he had a gun and his action on the plane was entirely consistent with his having a concealed weapon. The crew of an airplane many thousands of feet above the ground is not required to risk

The defendant was indicted on two counts: (1) aircraft piracy and (2) interference with a flight crew.[3] At the trial, the defendant did not dispute the above facts relating to the skyjacking. The sole defense raised was one of insanity. The defendant was found guilty by a jury of air piracy but found not guilty of interference with a flight crew.

Greene raises numerous issues on appeal, including: whether the evidence was sufficient to prove sanity beyond a reasonable doubt; whether the jury should have been required to make a special finding on insanity and instructed that such a finding of insanity would result in commitment of a defendant to a mental hospital pursuant to 24 U.S.C. § 211; whether the Government suppressed evidence or, alternatively, whether a subpoena pursuant to Rule 17(b), Fed.R. Crim.P. (indigent subpoena), should have been issued for a psychiatrist whose works were referred to by the prosecutor in cross-examination; whether the testimony of a Government psychiatrist violated defendant's Fifth or Sixth Amendment rights; whether the prosecutor's closing argument was prejudicial; whether the alleged inconsistency of the verdicts requires a reversal; and whether the trial court should have instructed the jury on diminished capacity.

## I. SUFFICIENCY OF THE EVIDENCE.

■ Greene initially contends that the evidence presented at the trial was insufficient to prove his sanity beyond a reasonable doubt. To succeed in this argument, the defense must demonstrate that all reasonable men must necessarily possess a reasonable doubt as to defendant's sanity. United States v. Velasco, 471 F.2d 112, 113 (7th Cir. 1972); United States v. Westerhausen, 283 F.2d 844, 852 (7th Cir. 1960).

Defense counsel produced substantial evidence that Greene was mentally ill at the time of the skyjacking. Five psychiatric experts, testifying on behalf of defendant, generally agreed that Greene was suffering from some form of paranoid schizophrenia. Three of the experts testified that defendant was incapable of conforming his conduct to the requirements of the law. The defendant also produced numerous lay witnesses who testified to his bizarre conduct and feelings of persecution in the year preceding the skyjacking.

There was, however, a significant amount of testimony presented by the Government to rebut the defendant's evidence of insanity. Two experts who had examined Greene testified on behalf of the Government. One psychiatrist, Dr. Feinerman, had interviewed Greene on 10 to 12 occasions, significantly more often than any defense expert. Dr. Feinerman testified to defendant's prolonged use of drugs and alcohol and analyzed Greene's condition as one of "toxic psychosis." Dr. Tuteur, the second Government psychiatrist, testified that defendant had an "inadequate personality," which Dr. Tuteur explained as a person who is unable to cope with the demands of life in a rational and practical manner and who may therefore escape by using alcohol and drugs. Both

---

the lethiferous consequences of an incorrect guess as to whether a person is armed as he says he is.

3. The relevant sections of 49 U.S.C. § 1472 respectively provide:

§ 1472(i)(2): "As used in this subsection, the term 'aircraft piracy' means any seizure or exercise of control, by force or violence or threat of force or violence and with wrongful intent, of an aircraft within the special aircraft jurisdiction of the United States."

§ 1472(j): "Whoever, while aboard an aircraft within the special aircraft jurisdiction of the United States, assaults, intimidates, or threatens any flight crew member or flight attendant . . . of such aircraft, so as to interfere with the performance by such member or attendant of his duties or lessen the ability of such member or attendant to perform his duties, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both. Whoever in the commission of any such act uses a deadly or dangerous weapon shall be imprisoned for any term of years or for life."

Government psychiatrists agreed that Greene was not a paranoid schizophrenic and that he could conform his conduct to the law.

The jury could also find, on the basis of the lay testimony presented by the Government, that Greene could so conform his conduct. Various members of the flight crew testified that the defendant appeared normal. In particular, the copilot, Boyd, who had sat next to Greene for most of the flight, testified to defendant's calm and rational behavior. Greene, at one point, discussed detailed matters of photography with the copilot. There was also evidence presented that the defendant was in debt and three witnesses (an FBI agent, a correction officer, and a defense psychiatrist) testified that Greene told each of them on separate occasions that his motive in skyjacking the plane was money. Two factors made the Government's lay testimony particularly credible. First, the jury may have concluded that the witnesses presented by the Government—airline employees, for the most part—were relatively less interested in the outcome of the case than were the lay witnesses of Greene and therefore the Government witnesses on an objectivity basis were more believable.[4] The defense lay witnesses, by contrast, were mostly friends and relatives of Greene. As noted by this court in United States v. Kissane, 478 F.2d 1098, 1100 (7th Cir. 1973), a jury may tend to discount such testimony from friends and relatives regarding defendant's bizarre conduct due to the witnesses' bias and desire to help. Second, the members of the flight crew testified to Greene's behavior during the skyjacking itself. Many of defendant's lay witnesses, on the other hand, testified to events which had occurred months before the crime. No defense witness testified to Greene's behavior on the day of the skyjacking. The skyjack-

ing note, which was legible and coherent, was also introduced into evidence by the Government.

The evidence from the non-lay witnesses relating to Greene's sanity was voluminous, technical, and complicated. Each side presented distinguished experts who came to learned but opposing conclusions. As we noted in United States v. Kissane, *supra* at 1100, "[i]n view of the complicated nature of the decision to be made—intertwining moral, legal, and medical judgments—it will require an unusually strong showing to induce us to reverse a conviction . . . . ."

Defense counsel argue that the picture derivable from Greene's activities is one of uncontrollable deterioration. However, the jury heard this evidence and apparently reached an opposite conclusion. We cannot say that the total picture was of the apodictical nature it occupies in the view of defense counsel.

The defense expert testimony, and arguments based thereon, when examined with dictionaries, medical and otherwise, in hand, can be construed as supportive of Greene's defense. However, other expert testimony, and arguments based thereon, is supportive of the prosecution. The ultimate resolution of the complex issues was made by the trier of fact which heard and evaluated conflicting evidence under proper instructions and in what appears overall to us to have been a fair trial.

Viewing the evidence, as we must, in the light most favorable to the Government, we are unable to say that a reasonable person must necessarily possess a reasonable doubt as to the defendant's sanity at the pertinent time.

## II. SPECIAL FINDING AND JURY INSTRUCTION.

The defense requested that the jury make a special finding on the issue of

---

4. In so stating, we do not think it necessary to equate a desire on the part of airline employees to put a stop to skyjackings, which desire we may assume existed, with a compulsion to distort the truth as to a complet-ed occurrence. The jury, of course, was free to consider the emotional impact of the incident upon the employees in the process of evaluating the credibility of their testimony.

Greene's sanity. Concomitantly, the defense requested that the court instruct the jury that should they return a verdict of not guilty together with a special finding of insanity, the court would thereupon certify the result to the Secretary of Health, Education and Welfare, who could order the defendant confined to a mental hospital until cured.[5] Such a procedure, according to the defendant, would eliminate the dilemma in which federal juries are placed, i. e., choosing between finding the defendant guilty or finding him not guilty because insane, with the latter verdict resulting in total freedom. This "gap," caused by the fact that there is no commitment where a defendant is judged not guilty by reason of insanity, the defense notes, has been filled by the vast majority of the States and the District of Columbia.[6] These jurisdictions all provide for some form of commitment, either mandatory or discretionary, where there is a verdict of not guilty by reason of insanity.

Greene suggests that we plug the federal gap through application of 24 U.S.C. § 211, which provides:

"If any person, charged with crime, be found, in the court before which he is so charged, to be an insane person, such court shall certify the same to the Secretary of Health, Education and Welfare, who may order such person to be confined in Saint Elizabeths Hospital [in the District of Columbia] . . . ."

According to the defendant, this statute enables any federal court, including those outside the District of Columbia, to commit to St. Elizabeths a defendant found not guilty by reason of insanity. Through the use of a special interrogatory, the determination of insanity would be made [7] which could trigger the applicability of the statute.

On its face, the statute would appear to apply to all federal courts regardless of location. The issue is whether, in the light of legislative history, judicial authority, and dispute in the subject area itself, we should, through judicial mandate, give the statute the broad application sought.

The legislative history of 24 U.S.C. § 211 indicates that it was originally intended to be limited to courts in the District of Columbia. When first enacted in 1857, § 211 was part of "An Act Supplementary to 'An Act to Organize an Institution for the Insane of the Army and Navy, and of the District of Columbia, in said District,'" 11 Stat. 157–158 (1857). In 1881, the Attorney General expressly stated that the statute was limited in application to the District of Columbia:

"I have no doubt that the generality of this language is, by the force of the title and the accompanying provisions, limited to courts in this [D.C.] District. Sufficient reasons will suggest themselves to every mind why Congress should make such provision for the insane of the Army and Navy and of this District, as States are expected to make for the insane person residing within their borders; but no reason

---

5. The instruction proposed by the defense read:
 "If you find the defendant not guilty and if your finding in the special interrogatory is that defendant was legally insane on April 17, 1972, the Court shall certify your result to the Secretary of Health, Education and Welfare, who may order the defendant confined in St. Elizabeth's Hospital in the District of Columbia until he is cured and it is deemed safe to release him."

6. The District of Columbia Code provides:
 "If any person tried . . . for an offense . . . is acquitted solely on the ground that he was insane at the time of

its commission, he shall be committed to a hospital for the mentally ill . . . ."
 24 D.C.Code § 301(d).

7. Both defendant and the Government agree that the special finding would serve no particular purpose unless 24 U.S.C. § 211 is found to authorize commitment by federal courts outside the District of Columbia. The Government objects to the use of such a special interrogatory on a number of grounds. However, due to our decision on the applicability of § 211, we find it unnecessary to reach the question of the propriety of the special finding.

can be suggested why an insane resident of Texas should be brought and maintained here." 17 Op.Att'y Gen. 211 (1881).

The weight of judicial authority, likewise, has not found § 211 applicable to federal courts outside the District of Columbia. In Sauer v. United States, 241 F.2d 640, 650–652 (9th Cir. 1957), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539, the Ninth Circuit, in determining the proper standard for insanity, noted:

"The choice today in this jurisdiction is not between confinement and commitment, but rather between confinement and freedom. . . . [I]f the jury acquitted appellant on the ground of insanity, there is no provision in the United States Code which would authorize the Government to have appellant committed. That a regrettable void exists in the law today in this respect is readily apparent."

The court in *Sauer* specifically noted that 24 U.S.C. § 211 was inapplicable:

"[A] careful reading of [§ 211] reveals its inapplicability to such situations, for it pertains solely to persons found to be insane, a finding which . . . cannot be made within existing federal criminal procedure. Moreover . . . the section has been administratively construed as applicable only to persons charged with crime before District of Columbia courts." 241 F.2d at 651–652 n. 32.

Instructions similar to that sought by the defendant in the present case have been denied by the Fifth, Eighth, and Tenth Circuits in Pope v. United States, 298 F.2d 507, 508–509 (5th Cir. 1962),

cert. denied, 381 U.S. 941, 85 S.Ct. 1776, 14 L.Ed.2d 704 (1965); White v. United States, 387 F.2d 367 (5th Cir. 1967); Pope v. United States, 372 F.2d 710, 731–732 (8th Cir. 1967), vacated for resentencing, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968), cert. denied, 401 U.S. 949, 91 S.Ct. 953, 28 L.Ed.2d 232 (1971); United States v. Borum, 464 F.2d 896, 900–901 (10th Cir. (1972). See also United States v. McCracken, 488 F.2d 406, 416–417 (5th Cir. 1974); United States v. Shapiro, 383 F.2d 680, 686–687 (7th Cir. 1967); United States v. Freeman, 357 F.2d 606, 625–626 (2d Cir. 1966).[8]

The only judicial authority suggesting that § 211 might be applicable outside the District of Columbia is found in dicta in Pollard v. United States, 282 F.2d 450, 464 (6th Cir. 1960). No case has been found in which the denial of an instruction like that sought in the present case has been held to be reversible error.

Members of Congress apparently have also assumed that 24 U.S.C. § 211 does not provide authority for federal commitment where there is a verdict of not guilty by reason of insanity. In recent years, a number of bills differing in scope and procedure have been introduced to provide for such a procedure. S.979, 91st Cong., 1st Sess. (1969); S. 1007, S.2740, 90th Cong., 1st Sess. (1967); S.3689, S.3753, 89th Cong., 2d Sess. (1966). There has been questioning of the constitutionality of such a commitment by a federal court.[9]

Finally, it should be noted that commentators have disagreed as to the merits of commitment after acquittal by reason of insanity.[10]

8. Commentators have similarly assumed that there is no federal commitment procedure available, outside the District of Columbia, to restrain a defendant presumably found not guilty by reason of insanity. Dession, The Mentally Ill Offender in Federal Criminal Law and Administration, 53 Yale L.J. 684, 696 (1944); Figinski, Commitment After Acquittal on Grounds of Insanity, 22 Md. L.Rev. 293, 296 (1962); Tydings, A Federal Verdict of Not Guilty by Reason of Insanity and a Subsequent Commitment Procedure,

27 Md.L.Rev. 131, 131–32 (1967); Note, Federal Commitment of Defendants Found Not Guilty by Reason of Insanity—Proposed Legislation, 52 Iowa L.Rev. 930 (1967).

9. *E. g.*, *Tydings, supra,* note 8 at 138; Note, 52 Iowa L.Rev., *supra,* note 8.

10. *E. g.*, *Figinski, supra,* note 8; Comment, Compulsory Commitment Following A Successful Insanity Defense, 56 Nw.U.L.Rev. 409 (1961); Comment, The Insanity Defense: The Need for Articulate Goals at the

■ Given this background, we are of the opinion that any change in the generally accepted interpretation of § 211 should come from Congress, which thus far has not chosen to act notwithstanding the background with which the legislative body is presumably acquainted.

We do not mean to suggest by this decision that the "gap" existing in the federal court procedures should not be plugged. We merely decline to engage in judicial legislation.[11]

Our declination also extends to the perilous course of speculating as to whether a jury verdict was motivated or actuated by a belief entertained by members of that jury which belief, of necessity, was based upon a privately entertained concept and not upon anything brought out in evidence during the course of a trial, nor adverted to in instructions.

Judge Stevens postulates his dissenting opinion on the premise that the jury probably assumed that a not guilty verdict would release the defendant upon society and that one of the court's instructions by negative implication "may well have given" the jury the "impression" that it would be appropriate for them to be concerned about the matter. It appears to us that it could be equally forcefully argued that the jurors, frequently being drawn from areas other than the metropolitan areas where the federal courts sit and thereby being better acquainted with state court procedures, would assume that there would be mental hospital commitment following a finding of acquittal where the defense of insanity had been raised.

Either approach strikes us as pure and simple (and impermissible) specula-

tion. One of the most elusive quests in which trial lawyers indulge from time to time is to determine which facts or factors prompted a particular jury verdict. In some instances the judiciary may presume that the likelihood of prejudice from certain factors is so great that reversal is required, for example, if the prosecutor had argued to the jury that the defendant must be guilty because he did not take the witness stand.

Here we have no foundation on which to erect the presumption of prejudice other than that of speculation. Yet we are called upon by the dissent to find plain error, requiring a reversal, in the failure of the court to suggest somehow to the jury that perhaps the defendant might be confined if he was acquitted.

The observations of Judge Goldberg in a comparable case appear to be particularly apt.

"Imagination in re-living the trial is here not sufficient, but must be accompanied by speculation as to what would have appeared had the claim of error been considered. Speculation wastes time and bears ephemeral fruit. For this reason this Court has held that there is no 'plain error' where, irrespective of the substantiality of the claimed error, the record does not present the question in enough detail. . . . The present case classically illustrates the soundness of this rule. Whether or not there was error was not visible because all of the circumstances of the arrest were not before the court. That which is not visible cannot be 'plain.' We are not equipped for divination." Sykes v. United States, 373 F.2d 607, 612–613 (5th Cir. 1966), cert. denied, 386 U.S. 977, 87 S.Ct. 1172, 18 L.Ed.2d 138 (1967).

---

Acquittal, Commitment, and Release Stages, 112 U.Pa.L.Rev. 733 (1964).

11. The defense also argues that denial of the requested special interrogatory and jury instruction violated United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968). Defendant contends that since at a bench trial the judge, under Rule 23(c),

Fed.R.Crim.P., makes special findings of fact, a "cost" has been placed on a jury trial. This argument, however, only goes to the matter of the special findings. Since we have found § 211 inapplicable—whether a bench trial or a jury trial is utilized—a special finding on Greene's sanity would have served no purpose.

Even if we put aside any concept that juries do conscientiously endeavor to decide cases on the basis of the law and the evidence and not on factors not presented to them, there is nothing in the record which made the status of the defendant after acquittal visible to the jury. The district court in its instructions told the jury that they should not give any consideration to the matter of punishment "in determining the guilt or innocence of this defendant." Since reference was made both to guilt and innocence, it would not seem unreasonable to assume, if we were to speculate on what the jury was thinking, which opportunity we continue to resist, that "the matter of punishment," even though it by definition would not include commitment for mental illness, would at least be interpretable by the jury so as to include lack of punishment as well as imposition of punishment.

We also note the court's instruction, "[i]f the evidence in the case leaves you with a reasonable doubt as to whether the defendant was sane at the time of the alleged offense, you will find him not guilty, even though it may appear that he was sane at earlier or later times." The instruction given appears to be inconsistent with the instruction proposed in the dissenting opinion to the effect that if the defendant was found to be insane at the time of the offense it would be presumed that the insanity continued.[12] It appears to us that a trial court would indeed be engaging in unwarranted judicial activism to attempt to instruct the jury as to the status of the federal defendant found not guilty by reason of insanity when there is such a complete lack of guidelines to determine just what the disposition would be.

We have considered the present phase of the issue in the context of the plain error rule. Reversal for "plain error" requires "error both ob-

vious and substantial," or "serious and manifest errors"; and such reversal should be exercised cautiously and only in exceptional circumstances, 3 Wright, Federal Practice and Procedure § 856 (1969). In that background, we are unpersuaded that the failure of the district judge to embark on his own motion in instruction in the uncharted area of the law here involved should be the basis of reversing the conviction. We do not mean to suggest that under appropriate circumstances the duty may not arise for the trial judge to give instructions on his own motion to assure a fair trial. We merely are holding that the circumstances were not appropriate in the present case.

While we do not decide the question, we are of the opinion that it is arguable whether it would have been erroneous for the district court to have declined to have given an instruction patterned on the suggestions of the dissenting opinion had such a request been made.

One learned commentator on the subject has stated that "[o]nly in the District of Columbia, however, is the trial judge required to eliminate the ambiguity and tell the jury that there will be a commitment and release process administered by court and mental hospital. In a small number of other jurisdictions, the trial judge *may* advise the jury of these details if he chooses to do so." Abraham S. Goldstein, The Insanity Defense 144 (1967). (Emphasis added.) The District of Columbia rule, of course, is predicated on the code of that District as to which the entire panel is in agreement on its inapplicability here.

Professor Goldstein also observes that "the more common view is that it is improper to give the instruction because it would distract the jury from the insanity issue and would invite compromise verdicts." *Id.* at 261 n. 2.

We also note the reference in the dissenting opinion to the opinion of then

---

12. We have referred to the gap between the federal procedure and that of the state courts. Without surveying all of the state statutes, we do note that the Illinois act permits the trier of fact to determine, in the event of acquittal because of insanity, that the defendant has recovered from the condition. Ill.Rev.Stat. 38 § 1005–2–4(a) (1973).

**1078**

Judge Blackmun in Pope v. United States, 372 F.2d 710 (8th Cir. 1967). As a final word on the present issue, it appears appropriate to complete the quotation from that case:

> "In any event, we need not attempt to pass upon the scope and application of § 211. We merely hold that the court's refusal to instruct about hospitalization was not error and that justice does not require the specifics, *questionable at best,* which the defense demanded." *Id.* at 732. (Emphasis added.)

## III. THE MOTION TO DISCLOSE AND THE INDIGENT SUBPOENA.

The Government advised defense counsel that Dr. Ellinwood, a psychiatrist from Duke University, would testify for the Government. Dr. Ellinwood was brought to Chicago during the course of the trial but was never called as a witness. Defense counsel presented a motion to the trial court to order the Government to disclose the views of Dr. Ellinwood. In the alternative, the defense requested that an indigent subpoena be issued for Dr. Ellinwood, who had since returned to North Carolina. The district court denied both motions.

Defendant's motion to disclose is based on the suppression-of-evidence cases derived from Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). According to the defendant, the Government, in not disclosing Dr. Ellinwood's views, suppressed material evidence which might have been favorable to the accused. We are unpersuaded by this argument for two reasons.

First, defendant has failed to show that there was a suppression of any evidence. The Government provided defendant with the name and location of Dr. Ellinwood. Defense counsel, moreover, twice spoke to Dr. Ellinwood on the telephone and discussed with him his views on defendant's sanity. The present case is thereby distinguishable from the suppression cases. In Ashley v. Texas, 319 F.2d 80 (5th Cir. 1963), cert. denied, 375 U.S. 931, 84 S.Ct. 331, 11 L.Ed.2d 263, the court held that the Government's failure to disclose the existence of psychiatric opinions, indicating that the defendants were legally incompetent, was a suppression of evidence resulting in a denial of due process. In *Ashley,* however, the defense counsel knew nothing of the psychiatric examinations either during the trial or for a considerable period thereafter. A similar situation existed in United States v. Poole, 379 F.2d 645 (7th Cir. 1967), where this court held there had been governmental suppression of a medical report, when the defense counsel knew of neither the physician's identity nor his findings at the time of the trial. There is no suppression when, as is the case here, defense counsel has obtained, during the trial, knowledge of substantially the same evidence he claims has been suppressed. Rosenberg v. United States, 360 U.S. 367, 371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); Thomas v. United States, 343 F.2d 49, 54–55 (9th Cir. 1965). There is no indication that the Government was in possession of information which was unavailable or unknown to defense counsel. A thorough exploration of what Dr. Ellinwood knew was as near to Greene as the telephone and we have not been shown that that instrument's potential was not utilized.

Second, as will be discussed hereinafter in relation to the motion for an indigent subpoena, we do not regard Dr. Ellinwood's views or testimony to be sufficiently material to defendant's case to require a reversal.

Defendant's alternative motion for an indigent subpoena for Dr. Ellinwood was based on Rule 17(b), Fed.R. Crim.P., which requires a "satisfactory showing . . . that the presence of the witness is necessary to an adequate defense." The trial court is vested with wide discretion regarding the granting of such a subpoena, and only the abuse of such discretion is reversible error. United States v. Schultz, 431 F.2d 907, 910 (8th Cir. 1970). In exercising this

discretion, the district court should give consideration to the relevancy and materiality of the proposed witness.

Greene argues that Dr. Ellinwood's testimony would have been material to his defense since Dr. Ellinwood was an authority in the field of toxic psychosis and the prosecutor had quoted from Dr. Ellinwood's articles in cross-examining defense psychiatrists.

A number of factors, however, indicate that Dr. Ellinwood's testimony was not necessary for an "adequate defense." First, at the time defendant moved for the subpoena, the defense already had five medical experts to testify on the issue of Greene's sanity. Greene did not indicate to the district court in what way Dr. Ellinwood's testimony would add to that already available. Four defense experts, in fact, did testify at the trial about toxic psychosis, the alleged expertise of Dr. Ellinwood. Under these circumstances, Dr. Ellinwood's testimony would, at best, have been cumulative. Second, defense counsel admitted to the trial court that Dr. Ellinwood had told defense that any testimony he gave would be "balanced." It is, therefore, difficult to see how the absence of Dr. Ellinwood's testimony prejudiced defendant. Third, Dr. Ellinwood, as defense counsel admitted to the trial judge, had never examined defendant. If subpoenaed, Dr. Ellinwood could only testify on the basis of the reports of other physicians. Finally, the record indicates that the prosecution did not rely extensively on Dr. Ellinwood's articles in cross-examining defense experts. Four of the five defense experts were cross-examined about statements made by authorities other than Dr. Ellinwood. Only one defense psychiatrist, Dr. Boshes, was questioned about an article written by Dr. Ellinwood. The prosecutor did not portray Dr. Ellinwood as the only or the leading authority on toxic psychosis; nor did he place any greater weight on Dr. Ellinwood's article than he did on any other article used in the cross-examinations of defense experts. Furthermore, Dr. Boshes himself was cross-examined about articles written by authorities other than Dr. Ellinwood.

Under these circumstances, we conclude that there was no reversible error. *See* Wagner v. United States, 416 F.2d 558, 564 (9th Cir. 1969), cert. denied, 397 U.S. 923, 90 S.Ct. 915, 25 L.Ed.2d 104 (1970); Thompson v. United States, 372 F.2d 826, 828 (5th Cir. 1967).

## IV. ADMISSIBILITY OF DR. FEINERMAN'S TESTIMONY.

Defendant attacks the admission of the testimony of Dr. Feinerman, a Government psychiatrist, on three grounds: (1) the questioning of defendant by Dr. Feinerman, without notice to and in absence of counsel, violated Greene's right to counsel at a critical stage of the proceedings; (2) Dr. Feinerman's examinations of defendant violated Greene's right to remain silent; (3) the Government's failure to include Dr. Feinerman's name in its list of witnesses violated 18 U.S.C. § 3432. The Government had notified defense counsel that Greene would be examined on August 14, 1971, by Dr. Feinerman, a staff psychiatrist at the House of Corrections. Due to a busy schedule, the examination was postponed, without notice to defense counsel, until August 15. Subsequent to that date, approximately ten to twelve interviews were conducted by Dr. Feinerman.

### A. Right to Counsel.

This court specifically dealt, in United States v. Bohle, 445 F.2d 54, 66–67 (7th Cir. 1971), with the issue of the right to counsel at an examination conducted by a Government psychiatrist. In *Bohle,* we held that the trial court did not abuse its discretion in denying defendant's motion to have counsel present at such an examination. Quoting with approval from United States v. Albright, 388 F.2d 719, 726 (4th Cir. 1968), this court stated that from "the intimate and personal nature of the examination, we are satisfied that, except in the unusual case, presence of a third party in a legal and non-medical capacity, would severely limit the efficacy of the examination."

445 F.2d at 67. See also United States v. Baird, 414 F.2d 700, 711 (2d Cir. 1969), cert. denied, 396 U.S. 1005, 90 S. Ct. 559, 24 L.Ed.2d 497 (1970) ; United States ex rel. Wax v. Pate, 409 F.2d 498, 499 (7th Cir. 1969), cert. denied, 396 U. S. 830, 90 S.Ct. 83, 24 L.Ed.2d 81; Thornton v. Corcoran, 132 U.S.App.D.C. 232, 407 F.2d 695, 698–702 (1969).

■ Greene's position, moreover, has less merit than the situation in *Bohle*. Here, unlike the situation in *Bohle,* there is no indication that the defense made a motion to have counsel present at the examination. Defense counsel admit that although they had been notified of the scheduled examination on August 14, there was no attempt to visit Greene until August 21, one week later.

Defendant's reliance on Schantz v. Eyman, 418 F.2d 11 (9th Cir. 1969), cert. denied, 397 U.S. 1021, 90 S.Ct. 1259, 25 L.Ed.2d 530 (1970), does not help him. In *Schantz*, defense counsel refused the county attorney's request that defendant submit to an examination by a State psychiatrist. The county attorney then sent the State psychiatrist to defendant's home, without notice to defense counsel, to examine defendant there. The defendant refused to submit to the examination. At the trial, the State psychiatrist testified to this confrontation and the prosecution argued that this incident indicated that the defendant's defense of insanity was presented in bad faith. The court in *Schantz* held that it was error to admit the State psychiatrist's testimony since defendant had not had counsel at his confrontation with the psychiatrist. Defense counsel, the court noted, could have advised defendant on whether he should submit to the examination and how a refusal to submit might be used against him at

trial. The court in *Schantz* specifically did not reach the issue of whether the accused has a right to have counsel present at the pretrial examination itself. 418 F.2d at 14 n. 8. The issue determined by the Ninth Circuit in *Schantz* was merely whether a defendant has the right to counsel in deciding *whether* to submit to such an examination. *Schantz* is, therefore, not inconsistent with the cases, previously cited, which hold there is no absolute right to counsel at a pretrial psychiatric examination. United States ex rel. Wax v. Twomey, 465 F.2d 352, 353 (7th Cir. 1972).

In the present case, the rule of *Schantz* is inapplicable since defense counsel consented to the examination by Dr. Feinerman scheduled for August 14 and advised Greene to talk to Dr. Feinerman. There was a previous examination by Dr. Feinerman on August 3, of which defense counsel admittedly did not have prior knowledge. However, this examination was conducted as a result of warnings by defense counsel that Greene needed psychiatric help because his condition was "degenerating." Defense counsel later stated to the trial judge, moreover, that the August 3 session was "all right."

■ Finally, in relation to this right-to-counsel argument, the defendant complains that the Government failed to notify defense counsel that Greene was moved to Cermak Hospital for the examination and that the interview was postponed until August 15 and extended to a number of sessions.[13] We agree that the better practice would have been to inform defense counsel of these various changes. There was, however, no showing of actual prejudice resulting from the absence of this notice.[14] We therefore conclude that this failure to give

13. On August 10, in open court, defense counsel stated, "I am eager [for the Government] to have another doctor. I would have made it a point to go out and advise my client that he should talk fully and completely to any other doctor that wanted to examine him."
It does not strike us as extraordinary that in the sensitive task of analyzing and eval-

uating sanity, for which medical science has apparently not yet devised calibrated detection instruments, the examining doctor might well need more than several conversations for a full and complete examination.

14. Cermak Hospital is a separate building from the jail proper but is part of the correctional institution.

notice did not render the trial constitutionally defective.

### B. Right to Remain Silent.

As the second prong in its attack on Dr. Feinerman's testimony, defense argues that Dr. Feinerman should have informed Greene of his right to remain silent. Such a warning was particularly necessary, according to the defense, because Greene was misled into believing that Dr. Feinerman was a treating rather than an examining physician.

■ In *Bohle, supra,* this court held that an examination by a Government psychiatrist does not violate the Fifth Amendment privilege against self-incrimination. We noted in *Bohle* that the examination's "sole purpose is to enable an expert to form an opinion as to defendant's mental capacity to form a criminal intent. It is not intended to aid in the establishment of facts showing that defendant committed certain acts constituting a crime. . . . [I]t is impermissible to introduce into evidence on the issue of guilt any statement made by the defendant during the course of such an examination." 445 F. 2d at 66–67. *See also* United States v. Williams, 456 F.2d 217, 218 (5th Cir. 1972); United States v. Handy, 454 F. 2d 885, 888–889 (9th Cir. 1971), cert. denied, 409 U.S. 846, 93 S.Ct. 49, 34 L. Ed.2d 86 (1972); United States v. Baird, 414 F.2d 700, 707–708 (2d Cir. 1969), cert. denied, 396 U.S. 1005, 90 S. Ct. 559, 24 L.Ed.2d 497 (1970); United States v. Albright, 388 F.2d 719, 723–724 (4th Cir. 1968). Here, since Dr. Feinerman's testimony, presented in rebuttal, concerned only the issue of defendant's sanity and not the issue of whether defendant did in fact skyjack the plane, there was no violation of Greene's Fifth Amendment privilege.[15]

### C. Absence of Dr. Feinerman's Name from Witness List.

As the third and final prong of its attack on Dr. Feinerman's testimony, defense complains of the absence of Dr. Feinerman's name from the list of witnesses furnished by the Government. This presumably was furnished pursuant to 18 U.S.C. § 3432: "A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with . . . a list . . . of the witnesses to be produced on the trial for proving the indictment . . . ." Even though air piracy carried, by statutory provision, the potential of a death sentence, a question is presented as to the applicability of § 3432 because of Furman v. Georgia, 408 U.S. 238, 92 S. Ct. 2726, 33 L.Ed.2d 346 (1972). In the cases before the Court in *Furman,* which had been decided at the time of the present trial, the carrying out of the death penalty was held unconstitutional.

The Government, in any event, did purport to comply with the statute and we find it unnecessary to determine whether it was still required to do so.

Dr. Feinerman's name was not included in the witness list which was furnished since the Government had not yet received his report and, therefore, was unsure as to whether Dr. Feinerman would be called as a witness. The Government received the report on September 13, two days after the trial began, and conveyed it to defense after an intervening weekend on September 18. Dr. Feinerman testified as a rebuttal witness on September 20.

While the provisions of § 3432, if applicable, are mandatory, Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L. Ed. 429 (1892), the requirement has been held inapplicable to rebuttal wit-

---

15. The record, furthermore, does not support defendant's contention that he was misled into believing that Dr. Feinerman was a treating physician. Greene was present at a pretrial proceeding on August 10, at which Dr. Feinerman was described as a Government psychiatrist. Defense counsel later informed Greene that he would be approached by Dr. Feinerman on August 14 and advised him to cooperate.

nesses. Goldsby v. United States, 160 U.S. 70, 76, 16 S.Ct. 216, 40 L.Ed. 343 (1895). As the Second Circuit noted, moreover, "[t]he statute was never intended to preclude the United States from making use of any material testimony discovered during the progress of the trial, and all that it exacts of the prosecuting officer is that he shall in good faith furnish to the prisoner, before the trial, the names of all witnesses then known to him′ and *intended to be used at the trial.*" United States v. Rosenberg, 195 F.2d 583, 599–600 (2d Cir. 1952), cert. denied, 344 U.S. 838, 73 S. Ct. 20, 97 L.Ed. 652 (emphasis added).

In the present case, Dr. Feinerman testified only as a rebuttal witness. Furthermore, there is no indication that the prosecutor did not act in good faith. Since Dr. Feinerman's report was not prepared prior to trial, the Government was unable to determine whether he would be a witness.

▮▮▮ A principal purpose of § 3432 is to eliminate any element of surprise. Here, however, defense knew that Dr. Feinerman had examined defendant and that he therefore was a potential witness. Upon receipt of Dr. Feinerman's report, the defense had over two days to plan a cross-examination. Counsel's handling of the intricacies and complexities of this type of specialized testimony by the several expert witnesses they had called on behalf of Greene indicates that they could scarcely claim lack of knowledge or expertise in the area to which cross-examination of Dr. Feinerman would carry them. Under the circumstances, we cannot say that the failure to furnish Dr. Feinerman's name in the original list prejudiced defendant.

## V. EVIDENTIARY RULINGS.

The defendant complains of numerous evidentiary rulings made by the trial court.

▮▮▮ First, defendant claims that the trial court erroneously interfered with the redirect rehabilitation of defendant's mother, Mrs. Estopinal. On cross-examination, Mrs. Estopinal admitted making the statement in a letter (written after Greene's arrest) that her son was a "happy-go-lucky" type. On redirect, defense counsel did not ask Mrs. Estopinal to explain what she meant by this statement. Rather, defense counsel asked the witness what else she wrote in that letter without offering the letter into evidence. Defendant contends that the trial court's refusal to permit these questions on redirect violated the doctrine of completeness. Defendant's reliance on the evidentiary rule of completeness is misplaced since the doctrine applies to documents partially admitted into evidence. See McCormick, Evidence § 56 (2d ed. 1972). Here the letter itself was not evidence. In seeking to elicit statements previously made in a document, without introduction of the document itself, the defense was actually attempting to introduce a prior consistent statement. The introduction of prior consistent statements has been left to the discretion of the trial court. United States v. Lewis, 406 F.2d 486, 492 (7th Cir. 1969), cert. denied, 394 U.S. 1013, 89 S.Ct. 1630, 23 L.Ed.2d 39; Affronti v. United States, 145 F.2d 3, 8 (8th Cir. 1944). Here, any prior consistent statements in Mrs. Estopinal's letter were made *after* a motive to falsify arose, i. e., the arrest of her son. Further, we have some difficulty in discerning any impeaching qualities in the characterization of "happy-go-lucky," which might seem to equate with insanity as well as the converse. In this situation we cannot say that the trial court abused its discretion in refusing to admit such statements.[16]

Second, defendant complains of the Government's failure to furnish, three

---

16. We are not here dealing with a quotation taken out of context in such a manner as to present a distorted or incorrect version of what was meant. Thus, if a statement excised for interrogation, for example, were "he was crazy" we assume there would be no difficulty in showing that the complete statement was that "he was crazy about Beethoven, Bach, and Brahms."

days before the trial, the names of five witnesses (in addition to that of Dr. Feinerman, which we have already discussed) and the names and addresses of veniremen, as required by 18 U.S.C. § 3432. Our examination of this contention convinces us of a lack of prejudice to the defendant.

Third, defendant objects to the testimony of Gerald Laveroni, an agent of the Bureau of Narcotics and Dangerous Drugs, presented by the Government in rebuttal. Agent Laveroni described the young people of Los Angeles, where Greene had been living. In particular, Agent Laveroni testified to the type of people and drug usage at a nightclub which defense witnesses said defendant frequented. Defendant objects to this testimony on two grounds: relevance and the Government's failure to turn over Jencks Act material. As to the first objection, we think Agent Laveroni's testimony was relevant, since it placed defendant and his conduct in his environment. Laveroni's descriptions could aid the jury in determining whether Greene's conduct and manner of speaking were an indication of mental illness or merely part of a "fad" followed by many young people in the area of his residence. The agent's reference to the drug usage at the nightclub, moreover, was not unduly prejudicial as the jury had already heard of Greene's use of drugs from the various psychiatrists.

Defendant's Jencks Act objection relates to certain "patrol checks" written by Agent Laveroni regarding the narcotic activity at the nightclub. These "patrol checks" were not formal reports but merely slips of paper placed on the bulletin board of the Bureau. Even if we were to assume, *arguendo*, that these papers were in existence and were "statements" for the purposes of the Jencks Act, the trial court's denial of defendant's motion to produce the papers was, in any event, harmless error. Agent Laveroni testified only as to the general activities at the nightclub. He, at no time, had any personal contact with defendant. Under these circum-

stances, the failure to require production of these bulletins is not reversible error.

Fourth, defendant alleges error in the trial court's refusal to allow Mrs. Estopinal, mother of defendant, to testify on surrebuttal about the history of mental illness in the family. The possibility of a genetic base to schizophrenia was first mentioned by a defense psychiatrist, Dr. Holzman, while cross-examined by the prosecution. Later, Dr. Feinerman, presented by the Government on rebuttal, mentioned, during cross-examination by defense, that genetics may be important in schizophrenia. Defense then sought to present Mrs. Estopinal's surrebuttal testimony. Assuming, *arguendo*, that the proposed testimony would be otherwise admissible, it was, nevertheless, offered too late. Surrebuttal evidence must meet and reply to evidence presented by the plaintiff in rebuttal. McCormick, Evidence § 4 (2d ed. 1972). Mrs. Estopinal's testimony could not have rebutted Dr. Feinerman's since he did not claim that defendant's family had no history of mental illness. Dr. Feinerman merely stated that he himself knew of no such history. Mrs. Estopinal's testimony properly should have been presented as part of the defense's case in chief.

When the point of completion of a trial has been reached, which was the situation here, the trial judge should be vested with substantial discretionary powers to bring the evidentiary phase to a close, or to put it another way, to curb the natural tendency of vigorous counsel to get in the final word. We are not shown in the present case by an offer to prove that the supposed medical history had any significance or just what its factual nature might be. If it had been substantial or significant it was something which could have been readily known to the defendant and should have been brought before the jury as a part of the principal defense evidence.

Fifth, defendant claims that the Government admitted Greene was in-

sane at a pretrial hearing on bond reduction. The trial court erred, according to defense, in not admitting this prior Government statement as an admission of a party. At the pretrial hearing, the Government quoted from a psychiatric report which indicated that Greene was then insane, prefacing the quote with:

"On April 26, 1972 and May 18, 1972, the defendant was examined by a psychiatrist, Dr. Rubin. Among Dr. Rubin's findings were the following:"

By then quoting Dr. Rubin, the Government did not adopt those findings; it merely recited them. The statement cannot therefore be deemed an admission by the Government that the defendant was legally insane at the time of the skyjacking. We do not decide the extent to which it could have been admitted into evidence if it had been an admission.

■ Finally defendant contends that the Government failed to lay adequate foundations for the opinions of several lay witnesses, including three prison guards and two members of the flight crew. This court has recently noted that a distinction must be drawn between lay testimony as to observations and lay testimony as to opinions.

"There are two phases of the present matter. First, there is the question of lay witnesses testifying as to their observations of the person in question without the expression of an opinion as to mental capacity. Here the trial court should be liberal in admission. . . . Even brief observation would not exclude the evidence but merely go to its weight . . . .

The second phase of the matter involves the expression of an opinion by the lay witness. Here we are of the opinion . . . that the opinion can only be expressed where the witness has been qualified by sufficient association with an opportunity to observe the subject . . . ." United States v. Alden, 476 F.2d 378, 385 (7th Cir. 1973).

An examination of the record reveals that none of the prison guards stated an opinion as to Greene's sanity. In answer to the questions, each merely described his observations of defendant's actions, such as following orders, and, therefore, this testimony was properly admitted.

■ The two Government witnesses who did express opinions as to Greene's sanity were the copilot who sat next to Greene during the flight and the stewardess. These witnesses observed and spoke with defendant for a large part of the flight. Knowing of the skyjack note, these members of the flight crew were, of necessity, observing Greene's conduct closely and continuously. We cannot say there was insufficient observation to render the witnesses unqualified to testify. In Breland v. United States, 372 F.2d 629, 633 (5th Cir. 1967), a warden who observed the defendant during a twenty-mile automobile trip was held qualified to testify as to defendant's sanity. Similarly, in Edmonds v. United States, 106 U.S.App.D. C. 373, 273 F.2d 108, 114 (1959), cert. denied, 362 U.S. 977, 80 S.Ct. 1062, 4 L. Ed.2d 1012 (1960), a police officer who only observed the defendant during a short interview was held qualified to testify that defendant was sane. In the present case, since the observations of the members of the flight crew extended over much of the flight, there was an adequate foundation for their opinions.

## VI. PROSECUTOR'S CLOSING ARGUMENT.

Defendant next complains of improper and prejudicial remarks made by the prosecutor during closing argument. In particular, the defense cites several instances in which the prosecutor allegedly expressed his personal belief as to defendant's guilt, misstated the evidence in the case, and interjected statements not in evidence. Having carefully reviewed the closing argument, however, we find no incident which deprived Greene of a fair trial. Defense counsel, in fact, objected to only one of the alleg-

edly inflammatory statements. Had objections been timely made, the various comments singled out by defense could have been cured, if necessary, by instructions from the judge. United States v. Cerone, 452 F.2d 274, 289 (7th Cir. 1971), cert. denied, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972).

 Moreover, as this and other courts have noted, when dealing with an objection to the prosecutor's closing argument, the argument must be viewed as a whole to determine if it was unduly prejudicial. United States v. Cook, 432 F.2d 1093, 1107 (7th Cir. 1970), cert. denied, 401 U.S. 996, 91 S.Ct. 1224, 28 L.Ed.2d 535 (1971); United States v. Ramos, 268 F.2d 878, 880 (2d Cir. 1959). While a continuously inflammatory argument may be grounds for reversal, courts have long recognized that, on the other hand, the prosecutor cannot be restricted to a sterile recitation of uncontroverted facts. Judge Learned Hand thus noted:

"It is impossible to expect that a criminal trial shall be conducted without some show of feeling; the stakes are high, and the participants are inevitably charged with emotion. Courts make no such demand; they recognize that a jury inevitably catches this mood and that the truth is not likely to emerge, if the prosecution is confined to such detached exposition as would be appropriate in a lecture, while the defense is allowed those appeals in misericordiam which long custom has come to sanction." United States v. Wexler, 79 F.2d 526, 529–530 (2d Cir. 1935), cert. denied, 297 U.S. 703, 56 S.Ct. 384, 80 L.Ed. 991 (1936).

In the present case, the prosecutor's closing argument was predominantly a restatement of the testimony in an attempt to stress various details which indicated that defendant, while perhaps abnormal, was not legally insane. The relatively few and minor remarks to which defense now objects did not—when viewed in this larger context—prejudice the defendant.

## VII. CONSISTENCY OF THE VERDICTS.

Defendant also contends that his conviction cannot be sustained because the jury verdict of not guilty on the charge of interference with a flight crew is inconsistent with the verdict of guilty on the charge of air piracy. Defendant admits that the Supreme Court in Dunn v. United States, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932), held that consistent verdicts on separate counts are not required. See also United States v. Tankersley, 492 F.2d 962, 968–969 (7th Cir. 1974). The defense, however, directs our attention to the rationale given by Justice Holmes for the Dunn holding:

"Each count in an indictment is regarded as if it was a separate indictment. [Citation] If separate indictments had been presented against the defendant . . . and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as res judicata of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold." 284 U.S. at 393.

This rationale, according to defense, has been undercut by the recent Supreme Court decision, Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). In Ashe, three or four men robbed six poker players. The defendant in Ashe was tried for robbery of one player, who along with three others testified for the prosecution that each had been robbed. After he was acquitted due to insufficient identification evidence, the State recharged and retried the same defendant with the robbery of another player. The Supreme Court held that the doctrine of collateral estoppel constitutionally foreclosed this second trial to relitigate the same issue.

 At most, Ashe undercuts the dicta of the Dunn decision. The two situations which Justice Holmes analogized

in *Dunn*—inconsistent verdicts on different counts tried together in a single trial and relitigation in a second, separate trial of an issue previously tried and determined in favor of defendant— may not be as closely related as Justice Holmes thought. However, as Judge Friendly noted in United States v. Carbone, 378 F.2d 420, 422 (2d Cir. 1967), cert. denied, 389 U.S. 914, 88 S.Ct. 242, 19 L.Ed.2d 262, "the argument [in *Dunn*] was in no way essential to [Holmes'] conclusion." Rather, the holding of *Dunn* can be supported independently from Holmes' dicta. The true rationale for the rule permitting inconsistent verdicts in a single trial is that a jury may convict on some counts but not on others not because they are unconvinced of guilt, but because of compassion or compromise. United States v. Fox, 140 U.S.App.D.C. 129, 433 F.2d 1235, 1238 n. 22 (1970); United States v. Carbone, *supra*, 378 F.2d at 422–423. "Indeed, if the rule were otherwise, the Government would be entitled to have the jury warned that an acquittal on some counts might undermine a guilty verdict on others—almost the opposite of the standard instruction, which is obviously beneficial to criminal defendants . . . ." United States v. Carbone, *supra*, 378 F.2d at 422.

We also find some merit in the Government's contention that the verdicts are not necessarily inconsistent since the jury could have found that although Greene exercised control over the aircraft, he did not interfere with the flight crew in that the plane went to the scheduled destination and crew members were not prevented from performing their normal duties.

## VIII. FAILURE TO INSTRUCT JURY REGARDING DIMINISHED CAPACITY.

Acknowledging that air piracy is a general intent crime, United States v. Bohle, *supra*, 445 F.2d at 60, defendant nevertheless urges that two proffered instructions regarding diminished capacity to formulate specific intent were er-

roneously refused. The basis for the alleged propriety of the two instructions is the indictment's use of the terms "knowingly" and "willingly" in describing defendant's conduct. In effect, defendant argues that the Government was required to prove specific intent not because the statute demands it but because the indictment refers to specific intent.

This argument is without merit. The language of the indictment, insofar as it goes beyond alleging the elements of the statute, is mere surplusage. Such surplusage in an indictment need not be proved. United States v. Archer, 455 F.2d 193, 194 (10th Cir. 1972), cert. denied, 409 U.S. 856, 93 S. Ct. 135, 34 L.Ed.2d 100; Milentz v. United States, 446 F.2d 111, 114 (8th Cir. 1971); Gawne v. United States, 409 F.2d 1399, 1403 (9th Cir. 1969), cert. denied, 397 U.S. 943, 90 S.Ct. 956, 25 L. Ed.2d 123 (1970). The defendant relies on Ex parte Bain, 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887), in which the Supreme Court held that an indictment cannot be amended by the trial court after it has been found and presented by a grand jury without resubmission to the grand jury. In Ford v. United States, 273 U.S. 593, 602, 47 S.Ct. 531, 71 L.Ed. 793 (1927), however, the Court expressly stated that the disregarding of surplusage in an indictment is not prohibited by the holding in Ex parte Bain. Since the air piracy statute only requires proof of a general intent, the trial court did not err in refusing instructions relevant to specific intent crimes.

## IX. CONCLUSION.

We have not been unmindful that, although a person who is unable to conform his conduct to the requirements of the law should not be held to the penalties of the criminal law, asserting that defense is regarded by far too many people with cynicism as being a sham and a device "to beat a rap." When the defense is asserted in the context of a crime which has aroused the citizenry as very few others have, the difficulty of

achieving an acquittal is compounded. For this reason, we have given careful attention to each contention of the defendant and to the record in this cause, and in so doing perhaps have unduly extended this opinion. We are convinced that the defendant was accorded a full and fair trial and that there is no basis for reversal. Accordingly, the judgment of the district court is affirmed.

Affirmed.

STEVENS, Circuit Judge (dissenting).

Defendant requested the district court to instruct the jury that if they should return a not guilty verdict, he would be confined in St. Elizabeth's Hospital until it was safe to release him. If 24 U.S.C. § 211 means what it says, that request was proper. However, as Judge Pell has demonstrated, it is unlikely that a literal reading of § 211 reflects the actual intent of the Congress which enacted it in 1857. Somewhat reluctantly I have therefore concluded that the reading of § 211 which is consistent with the policy judgments of 49 state legislatures, as well as the plain meaning of its text, is one which we may not in good conscience adopt.[1] Nevertheless, I am persuaded that the defendant's request was sufficient to require the district court to give an instruction that would minimize or avoid the manifest prejudice inherent in the jury's probable assumption that a not guilty verdict would endanger society by setting free a violence prone, mentally disturbed person.

The likelihood of prejudice in this case is great because the guilty verdict was returned in the face of an especially strong insanity defense.[2] The defendant presented five witnesses, who testified, in effect, that on the day in question the appellant was unable to conform his conduct to the dictates of the law. Four of his witnesses were members of the faculties of the distinguished medical schools at Northwestern University and the University of Chicago; the experts' conclusions were arrived at independently at the two universities. Since this testimony need only have cast a reasonable doubt upon defendant's sanity for the jury to have been required to find in

1. The judicial interpretations of § 211 limiting its applicability to the District of Columbia are based upon an 1881 opinion of Attorney General MacVeagh. 17 Op.Att'y Gen. 211. That opinion rests upon an interpretation of the legislative intent of the 1857 Act which became § 211; and that interpretation, in turn, relies, in part, on a doctrine of federalism which is no longer viable. For example, he wrote, "Sufficient reasons will suggest themselves to every mind why Congress should make . . . provision for the insane of the Army and Navy and of this District, as the States are expected to make for insane persons residing within their borders; *but no reason can be suggested why an insane resident of Texas should be brought and maintained here.*" 17 Op.Att'y Gen. at 212 (emphasis added). This language suggests at least the possibility that the Attorney General's opinion is predicated upon the assumption that insanity was something remediable under the *parens patriae* of the states only; that, in other words, the federal government was incompetent to act. After a century, it is difficult to defend such a formalistic premise. Federal police power has grown to such an extent that, in a very real sense, persons are subjects of two sovereigns—federal and state—whose interests overlap.

Arguably, the Act of 1857 might be construed as an attempt by Congress to legislate to the full extent of its power—or possibly to the full extent of the need for federal legislation in this area—and as both the scope of federal power and the coverage of federal criminal legislation have grown, an interpretation of the language of this statute recognizing a comparable growth in its coverage would certainly not have been unreasonable.

Indeed, Congress itself has enlarged the coverage of § 211 to make it possible for "an insane resident of Texas," for example, to be "brought and maintained here" in the district. See 24 U.S.C. §§ 211a, 212. And, as noted in the text, the number of state legislatures that have made the policy judgment that some type of commitment procedure should be expressly prescribed has grown to at least 49, and the 50th State, Tennessee, appears to be in the process of making the same judgment. See Prop. Tenn.Code of Crim.Pro. § 40-2321 (1973).

2. For this reason, I think that the failure to give *some* instruction amounted to a defect "affecting substantial rights" constituting plain error under Rule 52(b), F.R.Crim.P.

his favor,[3] I have little doubt that the supposed consequences of acquittal may have substantially affected their deliberations.[4]

The Government seems to assume that the absence of a federal statute providing for mandatory institutionalization of a defendant found not guilty by reason of insanity leads inexorably to the conclusion that such a defendant must be discharged immediately upon acquittal. Although it would certainly be desirable to have federal legislation dealing explicitly with the problem, I do not believe our district judges are as impotent as that assumption implies.

If the evidence overwhelmingly establishes that a skyjacker, for example, was insane at the time of his act, and that he is virtually certain to resume his violent behavior as soon as he is set free, must we then conclude that the only way to protect society from such predictable harm is to find an innocent man guilty of a crime he did not have the capacity to commit? I am unwilling to accept that conclusion and I do not believe juries should be permitted to determine the guilt or innocence of an accused citizen on the assumption that our federal judicial system is so hypocritical.[5]

The court's power over a person charged with a federal offense is not limited narrowly to the imposition of the sentence authorized by statute. If the individual is incompetent, he is subject to federal detention for a period that may exceed the maximum statutory sentence. This result may follow either from the determination of incompetence in advance of trial,[6] or after conviction and immediately prior to the termination of his sentence.[7] Moreover, the statutory language authorizing federal institutionalization pursuant to a petition filed "after arrest and prior to the imposition of sentence" has been construed by the Supreme Court to encompass a period of time which survives the return of a not guilty verdict.[8] Finally,

---

3. See Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499.

4. The probability that the jury will make the assumption that a verdict of not guilty will result in an innocent but dangerous man going free must underlie the opinion of Chief Justice (then Circuit Judge) Burger in Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725, 728–729 (1957) (concurring opinion prepared jointly with Prettyman, J.) That opinion maintains, contrary to general practice, that the jury should be advised about the practical consequences of returning a verdict of not guilty by reason of insanity. See A. Goldstein, The Insanity Defense, 143–44 (1967). In his opinion in *Lyles*, Judge Burger relied on Taylor v. United States, 95 U.S.App.D.C. 373, 222 F. 2d 398, 404 (1955), where the Court stated:

"The appellant says the judge told the jury, in effect, that if the appellant was acquitted he would go free. We think he did not convey that erroneous idea. But we think that when an accused person has pleaded insanity, counsel may and the judge should inform the jury that if he is acquitted by reason of insanity he will be presumed to be insane and may be confined in a 'hospital for the insane' as long as 'the public safety and * * * [his] welfare' require. *Though this fact has no theoretical bearing on the jury's*

verdict *it may have a practical bearing."* (Emphasis added and footnotes omitted.)

5. Of course, the apparent hypocrisy could be obviated by rules which eliminate questions of intent or mental competence from the determination of an individual's responsibility for his anti-social conduct, and postpone such issues to the sentencing or other dispositional process. See Judge Murrah's thoughtful opinion in Wion v. United States, 325 F.2d 420, 428–430 (10th Cir. en banc 1963).

6. A determination of mental incompetency after arrest and before trial in accordance with the provisions of §§ 4244, 4246 and 4248 may result in commitment running "until the sanity or mental competency of the person shall be restored. . . ." See 18 U.S.C. §§ 4247 and 4248.

7. See 18 U.S.C. §§ 4245 and 4247.

8. Speaking for the Court in Lynch v. Overholser, 369 U.S. 705, 82 S.Ct. 1063, 8 L.Ed. 2d 211, Mr. Justice Harlan made the following comment on the "prior to the imposition of sentence" language used in the District of Columbia Code: "Since this inquiry may be undertaken at any time 'prior to the imposition of sentence,' it appears to be as available after the jury returns a verdict of not guilty by reason of insanity as before trial." 369 U.S. at 719. The precise language

there is an inherent power in federal judges, as in common law judges, to take some action to protect society from the manifest danger that might follow premature release of an obviously deranged person in federal custody. As Mr. Justice Clark reminded us in Lynch v. Overholser, 369 U.S. 705, 724, 82 S.Ct. 1063, 1074, 8 L.Ed.2d 211 (dissenting opinion), "At common law, before 1800, the trial judge had power to order detention in prison of an acquitted defendant he considered dangerous because of insanity." [9] Both English and American judges used this power to direct confinement of the dangerous defendant acquitted by reason of insanity. See Hadfield's Case, 27 How.St.Tr. 1281, 1354 (1800); United States v. Lawrence, 26 Fed.Cas. pp. 887, 891 (No. 15,557) (C. C.D.C.1835).[10] At the very least, in a case in which the defendant has successfully maintained an insanity defense, the federal court could withhold the entry of judgment on a not guilty verdict until appropriate state officials were given an opportunity to take essential protective action.[11]

There is no question in my mind about a federal court's power to retain temporary custody of a defendant who has taken the position at trial that he was insane at the time of the alleged offense.[12] A presumption that his mental illness has continued to exist is accepted as adequate to support a mandatory commitment statute. There is no reason why a trial judge may not accept the same presumption; indeed, the defendant's request for an instruction that acquittal will be followed by commitment should imply consent to such action. Nor, notwithstanding the doubts that once were expressed, is there any valid reason to conclude that federal power over such a person is lacking. Normally it is the effect of his conduct on some aspect of interstate commerce that justifies the exercise of federal judicial power; that effect—and therefore the basis for federal jurisdiction—is identical whether the defendant be moti-

which he there construed also appears in 18 U.S.C. § 4244. It is true that his reference to § 4244 in footnote 12 of his opinion seems to assume, as indicated by the title of § 4244, that that section relates only to the period after arrest and before trial; nevertheless, the construction of the critical words quoted in the text of his opinion would necessarily be applicable to the identical language used in the text of § 4244 notwithstanding the inference created by the title of that section.

9. It is well established that, notwithstanding the tautology expressed in the Tenth Amendment, federal judges have the essential powers of common law judges. In Ex Parte Peterson, 253 U.S. 300, 312, 40 S.Ct. 543, 547, 64 L.Ed. 919, for example, Mr. Justice Brandeis observed: "Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties." (The comment was admittedly made in a different context, but at least one commentator thought it relevant to the problem of mental competency of federal criminal defendants. See Dession, The Mentally Ill Offender in Federal Criminal Law and Administration,

53 Yale L.J. 684, 688 n. 17 (1944).) Consider also the following comment by Chief Justice Hughes: "Under the Federal Constitution the essential prerogatives of the trial judge as they were secured by the rules of the common law are maintained in the federal courts." Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 699, 77 L.Ed. 1321.

10. Such power appears to have been exercised upon grounds of danger to the community. Mandatory, as opposed to discretionary, commitment for any person acquitted on grounds of insanity apparently did require statutory authority. See 39 & 40 Geo. III, c. 94; 24 U.S.C. § 211.

11. Instances of informal cooperation between the federal prosecutor and state authorities are reviewed in Senator Tydings' article, A Federal Verdict of Not Guilty By Reason of Insanity and a Subsequent Commitment Procedure, 27 Md.L.Rev. 131, 133–135 (1967).

12. The Second Circuit's expression of confidence that "the several states will continue to step into the breach" may imply agreement with this premise. See United States v. Freeman, 357 F.2d 606, 625–626 (1966).

vated by a criminal intent or by a deranged mind.[13]

If I am correct in my belief that a not guilty verdict entered in this case would not have been followed by the defendant's immediate release, quite clearly his defense was irretrievably prejudiced if the jury made such an assumption. On the other hand, even if I am incorrect in my assumption that there is power in the district court to avoid the immediate release of a violent, insane defendant following his acquittal, it is nevertheless equally true that the jury should not determine the issue of guilt or innocence on the basis of its fear of how an insane man may behave if acquitted.[14] Regardless of how the sovereign handles the problem of dealing with persons who are found not guilty by reason of insanity, the shortcomings, if any, in the discharge of the sovereign's responsibility clearly should not be permitted to distort the deliberations of a jury.

What, then, should the trial judge have done in this case? The probability of prejudice resulting from uncertainty concerning the disposition of the defendant in the event of an acquittal was raised and, I believe, should have been covered in the instructions. Although I have concluded that the trial judge correctly refused the specific instructions tendered by defense counsel, in order to avoid manifest prejudice I believe he should at least have instructed the jury that if defendant were acquitted, it would be presumed that his insanity continued; that it would be the responsibility of the government to determine the disposition to be made of him; and that questions concerning such disposition, like questions relating to punishment in the event of conviction, are mat-

13. In short, I do not accept the premise on which the analysis of federal authority to commit insane defendants is predicated in the note entitled Federal Commitment of Defendants Found Not Guilty By Reason of Insanity—Proposed Legislation, 52 Iowa L. Rev. 930 (1967). See especially the paragraph at 937–938.

14. Consider the language of the first Mr. Justice Harlan in Davis v. United States, supra, n. 3:
 "Strictly speaking, the burden of proof, as those words are understood in criminal law, is never upon the accused to establish his innocence, or to disprove the facts necessary to establish the crime for which he is indicted. It is on the prosecution from the beginning to the end of the trial, and applies to every element necessary to constitute the crime. * * * [A defendant's] guilt cannot be said to have been proved beyond a reasonable doubt—his will and his acts cannot be held to have joined in perpetrating the murder charged —if the jury, upon all the evidence, have a reasonable doubt whether he was legally capable of committing crime, or (which is the same thing) whether he wilfully, deliberately, unlawfully, and of malice aforethought took the life of the deceased. As the crime of murder involves sufficient capacity to distinguish between right and wrong, the legal interpretation of every verdict of guilty as charged is that the jury believed from all the evidence beyond a reasonable doubt that the accused was guilty, and was therefore responsible, criminally, for his acts. How then upon principle or consistently with humanity can a verdict of guilty be properly returned, if the jury entertain a reasonable doubt as to the existence of a fact which is essential to guilt, namely, the capacity in law of the accused to commit that crime?
 * * * * *
 "Thus, it is said, crimes of the most atrocious character often go unpunished, and the public safety is thereby endangered. But the possibility of such results must always attend any system devised to ascertain and punish crime, and ought not to induce the courts to depart from principles fundamental in criminal law, and the recognition and enforcement of which are demanded by every consideration of humanity and justice. No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them, by whomsoever adduced, is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." 160 U.S. at 487–488, 493.

ters that should not be given any consideration by the jury.

The trial judge did give the following standard instruction:

"Now, in determining the guilt or the innocence of this defendant, you should not give any consideration to the matter of punishment, for this question is exclusively the responsibility of the court." Tr. 1689.

By negative implication, the failure to make any reference to the consequences of an acquittal may well have given the jury the impression that it would be appropriate for them to be concerned about the risk that the defendant would be set free in the event they determined that he was insane.

The instructions in this case were, therefore, significantly different from those approved by the Eighth Circuit in Pope v. United States, 372 F.2d 710, 732 (1967); Mr. Justice (then Circuit Judge) Blackmun's summary of the relevant portion of the instructions and closing argument will highlight the difference between that case and this:

"We should note that in its closing argument to the jury the defense made what appears to be at least a collateral reference to Pope's possible custody in the event of acquittal:

" 'I wonder if you might in your deliberations feel or think about some concern about his custody if you find him not guilty. * * * I think you can assume that if you do your duty as jurors * * * others will do their duty in connection with Duane.'

Although permission for further comment about disposition had been de-nied by the court before final argument, the defense itself thus effected an implication. The court did the same in its instructions when it said, 'Just as you will discharge your duty under the law and the evidence you can assume that others will do the same as to any matters for their consideration'. We may not assume that all this was not apparent to the jury."

Admittedly, instructing the jury not to consider the consequences of an acquittal involves a significant risk to society. As the opinion of Chief Justice (then Circuit Judge) Burger in Lyles v. United States, *supra* n. 4, plainly indicates, the jury's assumptions with regard to the consequences of finding a defendant not guilty by reasons of insanity may have a significant influence on their deliberations. Therefore, if the jury should be given a persuasive instruction to disregard such consequences, and faithfully discharges its duty to do so, a certain number of defendants who are in fact insane and violent may be acquitted; since my optimism about the power of the federal court to protect the public from such dangerously ill persons may be unwarranted, they may then be set free and prey upon society. But to the extent that risk does exist, it may not legitimately be remedied by encouraging juries to return false verdicts out of fear of the consequences of a true finding of insanity; the only permissible way to avoid the risk is by the enactment of appropriate legislation.

In the past a somewhat chimerical fear of the possible release of defendants found not guilty by reason of insanity in the District of Columbia was adequate to persuade Congress to act swiftly.[15] Perhaps the realistic prospect

15. The genesis of the enactment of § 24–301(d) in the District of Columbia in 1955 in response to the decision in Durham v. United States, 94 U.S.App.D.C. 228, 214 F. 2d 862 (1954), is described in Lynch v. Overholser, *supra*, 369 U.S. at 715–717, and also in Mr. Justice Clark's dissent at 721– 722, 729–730. It is significant that Congress, notwithstanding a consistent exercise of the courts' preexisting discretionary power to order commitment, felt mandatory commitment was essential to avoid the risk that in a rare case a judge might exercise his discretion by not ordering confinement.

of the release of such persons by other federal courts is necessary to motivate Congress to close the so-called "gap" in the federal statutory scheme.[16] To say the least, it is unacceptable to deny an individual citizen his right to a fair and dispassionate consideration of the issue of his guilt or innocence because Congress has been derelict in the discharge of its responsibilities to the public at large.

In my opinion, this case presents one of the rare situations in which the failure of the trial judge to give any advice at all to the jury on a matter that must have loomed large in their deliberations constituted plain error. It is almost inconceivable to me that if the jury had put to one side any concern about the consequences of a not guilty verdict, they would not have entertained a reasonable doubt as to the defendant's sanity.[17] Since there is a substantial likelihood that the outcome of the jury's deliberations was affected by this omission, I would reverse and remand for a new trial with directions to give an instruction incorporating the substance of the charge, and the argument of counsel, described in Pope v. United States, *supra*.

16. Note the comment by Mr. Justice (then Circuit Judge) Blackmun in Pope v. United States, *supra*, 372 F.2d at 732, following his discussion of § 211: "We, too, hope that this gap, *if it exists*, in the federal system may soon be adequately remedied." (Emphasis added.) This "gap" could be identified either as the absence of statutory authorization for mandatory commitment or the absence of a statute expressly establishing a procedure for discretionary commitment. In either event, since 49 State Legislatures have done so, Congress certainly should address the issue. Each time Congress enlarges the scope of federal criminal jurisdiction, it also enlarges the significance of the "gap" and increases the irony of enacting legislation, such as § 211, which merely protects the legislators' immediate neighbors within the District of Columbia.

17. Even the prosecutor implicitly expressed such doubt when the question of pretrial custody was under consideration. In its opposition to a motion for bail, the Government described the examination by Dr. Rubin, a defense psychiatrist, and quoted the following from Dr. Rubin's report:

"Mr. Greene suffered from and still, though less so, suffers from a mental disease which substantially interfered with his capacity to conform his conduct to the dictates of the law . . . He had little or no control over his behavior prompted as it was by psychotic paranoid delusions." R. 56.

The expert's opinion was sufficiently reliable to serve the Government's purpose to confine defendant but is, according to the Government, unreliable when determining guilt or innocence.